# UNITED STATES DISTRICT COURT
# DISTRICT OF NEW JERSEY

| | |
|---|---|
| IN RE SCHERING-PLOUGH CORPORATION/ENHANCE SECURITIES LITIGATION | : Civil Action No. 08-397 (DMC)(JAD) <br> : <br> : Honorable Dennis M. Cavanaugh <br> : <br> : Motion Return Date: <br> : <br> : May 21, 2012 <br> : <br> : (Oral Argument Requested) <br> : <br> : *Document Electronically Filed* <br> : <br> : *Filed Under Seal* |

## REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF THE UNDERWRITER DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Alan S. Goudiss
Daniel H.R. Laguardia
**SHEARMAN & STERLING LLP**
599 Lexington Avenue
New York, NY  10022
(212) 848-4000
agoudiss@shearman.com
dlaguardia@shearman.com

*Attorneys for the Underwriter Defendants*

Jeffrey J. Greenbaum
Stuart M. Feinblatt
**SILLS CUMMIS & GROSS P.C.**
One Riverfront Plaza
Newark, NJ  07102
(973) 643-7000
jgreenbaum@sillscummis.com
sfeinblatt@sillscummis.com

*Attorneys for the Underwriter Defendants*

## **TABLE OF CONTENTS**

**Page**

INTRODUCTION ...................................................................................................1

ARGUMENT .........................................................................................................2

    I.    PLAINTIFFS' CLAIM UNDER SECTION 12(a)(2) SHOULD BE DISMISSED BECAUSE A REASONABLE INVESTIGATION COULD NOT HAVE UNCOVERED THE ALLEGED FRAUD ...........................................................................2

    II.   PLAINTIFFS' SECTION 11 CLAIM SHOULD BE DISMISSED BECAUSE THE UNDERWRITERS' INVESTIGATION WAS MORE THAN REASONABLE AND GAVE NO GROUND TO BELIEVE THAT THE OFFERING DOCUMENTS WERE MISLEADING ..................................................4

        A.    Plaintiffs Concede The Substance Of The Underwriters' Due Diligence Investigation ......................................................5

        B.    The Underwriters' Investigation Of The ENHANCE Trial Was More Than Reasonable ...............................................6

CONCLUSION .....................................................................................................16

# **TABLE OF AUTHORITIES**

## **CASES**

*In re Adams Golf, Inc. Sec. Litig.*, 618 F. Supp. 2d 343 (D. Del. 2009)....................5

*Ades v. Deloitte & Touche*, 1993 WL 362364 (S.D.N.Y. Sept. 17, 1993)................6

*Advo, Inc. v. Phila. Newspapers, Inc.*, 51 F.3d 1191 (3d Cir. 1995).........................3

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986)..............................................4

*Bouder v. Prudential Fin., Inc.*, 2010 WL 3515567 (D.N.J. Aug. 31, 2010)............4

*In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410 (3d. Cir. 1997)..........3, 10

*Chris-Craft Indus., Inc. v. Piper Aircraft Corp.*, 480 F.2d 341
 (2d Cir. 1972).....................................................................................................14

*Endo v. Albertine*, 863 F. Supp. 708 (N.D. Ill. 1994)............................................5, 6

*Escott v. BarChris Constr. Co.*, 283 F. Supp. 643
 (S.D.N.Y. 1968).................................................................................................14

*Feit v. Leasco Data Processing Equip. Corp.*, 332 F. Supp. 544
 (S.D.N.Y. 1971)...................................................................................................4

*In re Fortune Sys. Sec. Litig.*, 1987 WL 34632 (N.D. Cal. July 30, 1987) ...............6

*In re Int'l Rectifier Sec. Litig.*, 1997 WL 529600 (C.D. Cal. Mar. 31, 1997)...........4

*In re Metro. Sec. Litig.*, 2010 WL 424625 (E.D. Wash. Jan. 28, 2010)....................5

*Pa. Dental Ass'n v. Med. Servs. Ass'n of Pa.*,
 745 F.2d 248 (3d Cir. 1984) ...............................................................................3

*In re Refco, Inc. Sec. Litig.*, 503 F. Supp. 2d 611 (S.D.N.Y. 2007) ..................10, 12

*Schoch v. First Fid. Bancorp.*, 912 F.2d 654 (3d Cir. 1990)................................4, 5

*Schoonejongen v. Curtiss-Wright Corp.*, 143 F.3d 120 (3d Cir. 1998) ...................... 7

*In re Software Toolworks Inc.*, 50 F.3d 615 (9th Cir. 1994) .................................... 11

*In re Worldcom, Inc. Sec. Litig.*, 346 F. Supp. 2d 628 (S.D.N.Y. 2004) ......... *passim*

## STATUTES AND RULES

15 U.S.C. § 77k ........................................................................................................ 2, 4

15 U.S.C. § 77l(a)(2) ............................................................................................... 2, 3

17 C.F.R. § 230.176 .................................................................................................. 11

Fed. R. Civ. P. 56(e) ................................................................................................... 7

## OTHER AUTHORITIES

Securities Act of 1933, H.R. Conf. Rep. No. 73-152,
    73d Cong. (1st Sess. 1933) ............................................................................... 4

Securities Act Release No. 7606A, 63 Fed. Reg. 67174,
    (Dec. 4, 1998) .................................................................................................. 4

## INTRODUCTION

Plaintiffs admit that the Underwriters were not aware of any misstatements in the Offering Documents[1] and concede the substance of the multifaceted due diligence the Underwriters conducted on Schering and Organon – two massive life science and pharmaceutical companies.[2]  Their criticism is that the Underwriters should have asked "more" about the ENHANCE trial.  ███████████████
████████████████████████████████████████████████████████████
███████████████████████████████████████) (Pls. Opp. Br. at 18-19.)  That cannot be the difference between satisfactory and unsatisfactory due diligence.

Indeed, regardless of the questions posed, ████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████

---

[1]   Defined terms have the same meaning as in the Memorandum of Law in Support of the Underwriter Defendants' Motion for Summary Judgment dated March 1, 2012 ("Opening Brief" or "UW Br."). Lead Plaintiffs' opposition papers are referred to as follows:  the Corrected Memorandum of Law in Opposition to the Underwriter Defendants' Motion for Summary Judgment ("Pls. Opp. Br.") and their Corrected Response Pursuant to Local Rule 56.1 to the Underwriter Defendants' Statement of Undisputed Material Facts ("Pls. 56.1 Resp.").

[2]   (UW Br. at 7-8, 18-27; Underwriter Defendants' Rule 56.1 Statement in Support of Motion for Summary Judgment ("UW 56.1 St.") and Pls. 56.1 Resp. at ¶¶ 34, 54, 56-57, 59-61, 63-73, 75-77, 79-89, 91-94, 96, 98-117, 120, 122-140, 143, 149-52, 193.)



) Based only on that metaphysical uncertainty, Plaintiffs ask the Court to put it to a jury to speculate whether additional, hypothetical questions might have elicited additional information if posed by the Underwriters.

) Plaintiffs' nebulous, hindsight critiques do not and cannot create a genuine issue of material fact regarding that due diligence; indeed, the only disputes on this record appear to be between plaintiffs' counsel and their own expert. Summary judgment should be granted.

## ARGUMENT

I. **PLAINTIFFS' CLAIM UNDER SECTION 12(a)(2) SHOULD BE DISMISSED BECAUSE A REASONABLE INVESTIGATION COULD NOT HAVE UNCOVERED THE ALLEGED FRAUD**

Plaintiffs are mistaken that the same analysis applies to the defenses under Section 12(a)(2) and Section 11(b)(3) where it is conceded that the Underwriters could not have discovered the alleged fraud. The text of each statute provides a different structure by its plain terms. *Compare* 15 U.S.C. § 77l(a)(2) *with* 15 U.S.C. § 77k(b)(3). *See also In re Worldcom, Inc. Sec. Litig.*, 346 F. Supp. 2d 628, 663 (S.D.N.Y. 2004) ("Section 12(a)(2) has a defense of reasonable care that is less demanding than the duty of due diligence imposed under Section 11"). Unlike Section 11, Section 12(a)(2) provides a defense to liability for underwriters who

2

demonstrate that they "did not know, and in the exercise of reasonable care could not have known, of [an alleged] untruth or omission." 15 U.S.C. § 77l(a)(2). Here, it is established that was exactly the case. (Greenbaum Decl. Ex. 4, at 95; UW Br. at 13-14.) Plaintiffs' claims under Section 12(a)(2) should be dismissed on that basis.[3]

---

[3] ▮▮▮▮▮ *see also Advo, Inc. v. Phila. Newspapers, Inc.*, 51 F.3d 1191, 1199 (3d Cir. 1995) ("Expert testimony without [] a factual foundation cannot defeat a motion for summary judgment."); *Pa. Dental Ass'n v. Med. Servs. Ass'n of Pa.*, 745 F.2d 248, 262 (3d Cir. 1984) (expert opinion based upon mere "theoretical speculations" will not create a genuine issue of fact). ▮▮▮▮▮ the Offering Documents *did* disclose that "results in post-marketing Phase IV trials [which included the ENHANCE trial] may decrease demand for Schering-Plough's products." (*Id.* at 10, 14-15.) *See also In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1427, 1432 (3d Cir. 1997) ("The federal securities laws do not obligate companies to disclose their internal forecasts.") (citations omitted).

3

## II. PLAINTIFFS' SECTION 11 CLAIM SHOULD BE DISMISSED BECAUSE THE UNDERWRITERS' INVESTIGATION WAS MORE THAN REASONABLE AND GAVE NO GROUND TO BELIEVE THAT THE OFFERING DOCUMENTS WERE MISLEADING

Under Section 11, underwriters are protected from liability if, after conducting a "reasonable investigation," they had "reasonable ground for belief" and did in fact believe that the offering documents did not contain any material misstatement or omission. 15 U.S.C. §§ 77k(a), (c). A "reasonable" investigation is that which would be conducted by a "prudent man" investing his own property. *Id.* at § 77k(c). The standard, by its terms and as applied by the courts, is one of "reasonableness, not perfection," and courts have recognized that the due diligence defense exists because "Congress specifically rejected the notion of underwriters as insurers."[4] Because Plaintiffs concede that the Underwriters did not believe that the Offering Documents contained any material misstatement or omission (Greenbaum Decl. Ex. 4, at 95; UW Br. at 13-14), the only issue the Court needs to decide is whether the investigation was reasonable.[5]

---

[4]  *See In re Int'l Rectifier Sec. Litig.*, 1997 WL 529600, at *11 (C.D. Cal. Mar. 31, 1997); *Worldcom*, 346 F. Supp. 2d at 662 (citing H.R. Conf. Rep. No. 73-152, at 277 (1933); SEC Rel. 7606A, 63 Fed. Reg. at 67230); *see also Feit v. Leasco Data Processing Equip. Corp.*, 332 F. Supp. 544, 582 (S.D.N.Y. 1971) (underwriters' "duty to investigate should be considered in light of their more limited access").

[5]  "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *see also Bouder v. Prudential Fin., Inc.*, 2010 WL 3515567, at *2 (D.N.J. Aug. 31, 2010) (Cavanaugh, J.) (noting that "unsworn statements of counsel in memoranda" cannot meet the requirements of Rule 56(e)) (citing *Schoch v. First Fid. Bancorp.*, 912 F.2d 654, 657 (3d Cir. 1990)).

### A. Plaintiffs Concede The Substance Of The Underwriters' Due Diligence Investigation

Plaintiffs do not dispute the steps taken by the Underwriters in their lengthy and thorough investigation of both Schering and Organon.[6] Instead, Plaintiffs improperly contend that the overall investigation was irrelevant because it did not focus on the ENHANCE trial and did not sufficiently "test" ENHANCE-related statements. (Pls. Opp. Br. at 24 n.19, 35 n.34.) But, as Plaintiffs further concede, courts evaluate a due diligence investigation as a whole "within the context in which it was conducted" (Pls. Opp. Br. at 2), *i.e.*, without the benefit of hindsight (UW Br. at 11, 28). Furthermore, contrary to Plaintiffs' assertion that summary judgment based on a due diligence defense would be "extraordinary," courts regularly grant summary judgment for underwriters whose investigations were less exhaustive than the investigation completed here. (UW Br. at 12 n.8, 25-27.)

Indeed, in each case cited by Plaintiffs in which summary judgment was denied with regard to an underwriter's due diligence defense (Pls. Opp. Br. at 16 n.11, 37), such denial was premised on the fact that the underwriters received information that affirmatively **contradicted** statements in the offering documents.[7]

---

[6] (*See generally* UW Br. at 7-8, 18-27; UW 56.1 St. and Pls. 56.1 Resp. ¶¶ 34, 54, 56-57, 59-61, 63-73, 75-77, 79-89, 91-94, 96, 98-117, 120, 122-140, 143, 149-52, 193.)

[7] *See In re Metro. Sec. Litig.*, 2010 WL 424625, at *4 (E.D. Wash. Jan. 28, 2010) (underwriters received document from issuer's accountant raising an issue about the accuracy of the offering documents); *In re Adams Golf, Inc. Sec. Litig.*, 618 F. Supp. 2d 343, 351 (D. Del. 2009) (underwriters failed to investigate or disclose a marketing issue that the SEC had specifically requested the disclosure of in the offering documents); *Endo v. Albertine*, 863 F. Supp. 708, 732 (N.D. Ill. 1994) (the issue at bar was not the reasonableness of the underwriters'

5

There is no such allegation here. Instead, every single document that Plaintiffs point to – even those the Underwriters did not see – is consistent with the challenged statements in the Offering Documents.[8]

### B. The Underwriters' Investigation Of The ENHANCE Trial Was More Than Reasonable

Plaintiffs cannot reasonably claim that the Underwriters failed to investigate the ENHANCE trial. ▮

---

investigation – it was their failure to disclose millions of dollars in known contingent tax and environmental liability); *Ades v. Deloitte & Touche*, 1993 WL 362364, at *19-21 (S.D.N.Y. Sept. 17, 1993) (underwriters, who moved for summary judgment before discovery, unreasonably relied on accounting firm's report on issuer's financial statements, even though it was apparent from the face of the report that the review was incomplete); *In re Fortune Sys. Sec. Litig.*, 1987 WL 34632, at *4-6 (N.D. Cal. July 30, 1987) (underwriters were provided with information that directly contradicted statements in the offering documents).

[8]  Only the anonymous and unreliable post on cafepharma.com provided any information contrary to any of the Company's public statements – but no one thought those posts were important or trustworthy until after Plaintiffs brought this suit and argued they were relevant with hindsight. In fact, Plaintiffs' expert on market efficiency and materiality opined that the cafepharma posts were not credible. (Coffman Rpt., Dkt. 243, at ¶ 17, dated Sept. 15, 2011.) ▮



[redacted]

---

[9] (UW 56.1 St. and Pls. 56.1 Resp. ¶¶ 61, 77, 81-82, 109, 111, 145, 148-67, 194-96, 200-01.)

[10] (UW 56.1 St. and Pls. 56.1 Resp. ¶¶ 60-61, 81-82, 86-87, 153-67.) [redacted] This is insufficient to find a genuine issue of material fact. *See Schoonejongen v. Curtiss-Wright Corp.*, 143 F.3d 120, 130-31 (3d Cir. 1998) (stating that it is "axiomatic" that a non-moving party cannot defeat summary judgment simply by asserting that a jury might disbelieve an opponent); *see also* Fed. R. Civ. P. 56(e) (stating that if a party fails to properly address another party's assertion of fact, the court may "consider the fact undisputed for purposes of the motion").

███████████ Schering's size in 2007 ($15 billion in revenue) and complexity (with 15 different products each generating between one and eleven percent of revenue and over 100 ongoing clinical trials) is undisputed (UW 56.1 St. and Pls. 56.1 Resp. ¶¶ 1-3, 5), as is Organon's size ($4 billion in revenue) and complexity (an international pharmaceutical company with a diverse group of products in human and animal health). (UW 56.1 St. and Pls. 56.1 Resp. ¶¶ 18-20.) The ENHANCE trial was just one aspect of the overall investigation, and █████████

*First*, ENHANCE was only one of several major research and development events that Schering and analysts were expecting in the months following the Offerings.[12] While the ENHANCE trial was noteworthy because its results were to

---

[11] Plaintiffs miss the point when discussing the distortion presented by the assertion that Vytorin and Zetia would constitute 60-70% of reported earnings after the Organon merger. (Pls. Opp. Br. at 4 n.3.) It is not that the calculation of percentage of reported earnings was wrong; it is that reliance on earnings as a proxy for importance to Schering is misleading because a greater *portion* of revenue from Vytorin and Zetia was characterized as "earnings" than was the case for other Schering's products because of the way JV income was accounted for. The revenues from all of Schering's products, except for Vytorin and Zetia, were offset by the company-wide costs when profits were calculated, but JV income was not. (UW Br. at 28 n.11; Greenbaum Decl. Ex. 2, at 14-15; *id*. Ex. 3, at 319-24.)

[12] ████████████████████████

be published relatively soon after the Offerings, it was also the case that any of the 25 ongoing Phase IV clinical trials could have had an effect on Schering's revenue if their results or conduct had given rise to negative public disclosures. Problems with clinical trials can arise at any time, and it would have been impossible to investigate each of the trials for "effective unblinding" or hidden problems. [redacted]

[redacted]

[redacted] [redacted]



The delay in the release of the ENHANCE trial results was not a red flag because (i) Schering had publicly announced it, making it an accepted part of the total mix of information available to investors;[14] and (ii) the delay was not surprising.[15] In addition, Schering had publicly explained the cause of the delay.

---

[13]   *See Worldcom*, 346 F. Supp. 2d at 680-81 (a "red flag" exists when facts provide reason to believe that financial reporting or statements are inaccurate); *In re Refco, Inc. Sec. Litig.*, 503 F. Supp. 2d 611, 649 (S.D.N.Y. 2007) ("facts which come to a defendant's attention [and] place a reasonable party in defendant's position on notice of wrongdoing").

[14]   *See Burlington*, 114 F.3d at 1425-26 ("The omission or misstatement must also be material, *i.e.*, something that would alter the total mix of relevant information for a reasonable investor making an investment decision.").

[15]   According to the Food and Drug Administration, nearly 50 percent of all trials are delayed. (Greenbaum Decl. Ex. 1, at Ex. D; UW 56.1 St. and Pls. 56.1 Resp. ¶ 198.) Indeed, only 11 out of 169 analyst reports published between the announcement and the Offerings noted the delay. (UW 56.1 St. ¶ 199.)

▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ Similarly, other public information that Plaintiffs suggest indicated that the ENHANCE trial might have a negative result (certain analyst statements and the results of the METEOR trial) were not "red flags" because the possibility of failure was obvious and public.[17] ▇▇▇▇▇▇ ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

---

16  Plaintiffs improperly criticize aspects of the Underwriters' investigation, such as reliance on Schering representatives and public or previously known information, that are expressly provided for by SEC Rule 176, which states that "relevant circumstances" for evaluating whether an underwriter's due diligence "constitutes a reasonable investigation or a reasonable ground for belief" include, among other things, "[r]easonable reliance on officers, employees, and others whose duties should have given them knowledge of the particular facts," the type of issuer and the availability of information with respect to the issuer, and "cumulative due diligence." (UW Br. at 11-12, 16 (citing 17 C.F.R. § 230.176).) Plaintiffs attempt to explain away SEC Rule 176, because they assert it "did not affect the fundamental nature of underwriters' due diligence obligations." (Pls. Opp. Br. at 16 n.12 (quoting *Worldcom*, 346 F. Supp. 2d at 669).) But the language quoted by Plaintiffs addressed concerns that Rule 176 might "give underwriters a safe harbor from liability for statements made in incorporated Exchange Act reports," not the proper role of Rule 176 in providing guidance to courts deciding whether an underwriter's due diligence investigation was reasonable. *See Worldcom*, 346 F. Supp. 2d at 667-69; *In re Software Toolworks Inc.*, 50 F.3d 615, 621 (9th Cir. 1994). Management's statements about a blinded trial being conducted by a well established public company like Schering quintessentially fall under the approval of Rule 176.

17  Plaintiffs concede that these items made the public aware of the truism that the trial could be a failure. (Pls. Opp. Br. at 7, 10.) But Plaintiffs grossly distort the record when they claim that analysts "publicly singled out ENHANCE as the sole risk to Schering before the Offering." (Pls. Opp. Br. at 24.) A review of any of the analyst reports in the record makes clear that, when the ENHANCE trial is mentioned at all, it is just one of many issues discussed. (*See, e.g.,* Greenbaum Decl. Ex. 1, at Ex. C; Decl. of Graziano and McDonald in Supp. of Lead Pls.' Opp'n to the Underwriter Defs.' Mot. for Summ. J. Exs. 224, 221, 187.)

██████████████████████████████████████████████████

██████████████████████████████████████

████████████████████) If the posts were noteworthy at all, they were publicly known and every class member should have investigated them before purchasing Schering stock – that they did not shows that a prudent person would not do so.[18]

Indeed, if any of the information described above had been of a sort to have given a prudent person a "reason to believe" that the financial reporting or statements were inaccurate (*Worldcom, supra*) or to "place a reasonable party in defendant's position on notice of wrongdoing" (*Refco, supra*), then every potential investor in Schering would have also been on notice of such red flags. None of these purported red flags required specialized knowledge such that an investor would have needed to rely on an underwriter's expertise to understand and appreciate its import (or lack thereof). *Cf. Worldcom*, 346 F. Supp. 2d at 679, 687-88 (public financial information indicated accounting irregularities, but underwriters' expertise was required to interpret information for the market).

████████████████████████████████████████████████

████████████████████████████████████████████) But those

---

[18] None of the 193 analyst reports issued during the ten months prior to the Offerings mentioned cafepharma or rumors about the ENHANCE trial. (UW 56.1 St. and Pls. 56.1 Resp. ¶ 227; Greenbaum Decl. Ex. 1, at Ex. B.). Further, Plaintiffs' citation to a Valerie Ford article published two years after the Offerings cannot support the conclusion that anonymous message boards were part of a reasonable investigation in 2007. (Greenbaum Decl. Ex. 2, at 7-10.) And it is pure speculation that a Google search of common words like Vytorin and "enhance" would have hit on the cafepharma posts in mid-2007. (*Id.* at 22-23.)

documents, like the public ones, would not have been red flags even if they had been seen, because they do not suggest that the Offering Documents were misleading. ███████████████████████

███████████████████████████████████████

██████████████████████████████

██████████████████████████████

██████████████████████████████

██████████████████████████) Plaintiffs now claim, for the first time, that stock sales by one Schering executive were a red flag. (Pls. Opp. Br. at 27.) But they cite no evidence to associate these sales with the ENHANCE trial. (Graziano and McDonald Decl. Ex. 282, at 85-92.)

████████████████████

███████████████████████████████

██████████████████ ████████████

███████████████████████████████

██████████████████████████████

██████████████████████████

---

19 ████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████

13

██████████████████████████████████████████

██████████████████████████████████████████

████████████████████

No further "skepticism" or "testing" was needed than the investigation the Underwriters completed, and the two ancient cases on which Plaintiffs heavily rely to suggest the contrary, *Escott v. BarChris Construction Co.*, 283 F. Supp. 643 (S.D.N.Y. 1968), and *Chris-Craft Industries, Inc. v. Piper Aircraft Corp.*, 480 F.2d 341 (2d Cir. 1972), are entirely inapposite. In *BarChris*, an attorney for underwriters (i) missed information in the board minutes that directly contradicted statements that the issuer made during a due diligence meeting, (ii) failed to review any contracts, and (iii) did not review any accounting documents from the issuer. 283 F. Supp. at 693-94. In those circumstances, the court stated that, although "[i]t is impossible to lay down a rigid rule suitable for every case" and it will always be a "matter of judgment," the "underwriters must make some reasonable attempt to verify the data submitted to them." *Id.* at 697. In *Chris-Craft*, the underwriter had reviewed board minutes discussing "extensively" a transaction that directly contradicted the registration statement. 480 F.2d at 372. But the only additional investigation the underwriter undertook was to ask the company about the transaction. *Id.* The court ruled that the underwriter's actions "amounted to an almost complete abdication of its responsibility" because it "possessed enough information reasonably to deduce that the [] registration statement was materially inaccurate." *Id.* at 373.

██████████████████████████████████████████



[redacted] The investigation at bar is just like those that are regularly held to entitle underwriters to summary judgment on their due diligence defense, and nothing like those found to be lacking. Plaintiffs' claims should be dismissed on that basis.

Plaintiffs' claims should also be dismissed because they do not cite any evidence to support (a) their assertion that ATRS suffered cognizable damages with respect to its purchases of common and preferred securities or (b) their post-hoc use of LIFO/FIFO inventory conventions. (UW Br. at 38-40.)

## **CONCLUSION**

For the reasons set forth herein and in the Opening Brief, the Court should grant the Underwriters' motion for summary judgment and dismiss the Securities Act claims with prejudice.

Respectfully submitted,

**SILLS CUMMIS & GROSS P.C.**
One Riverfront Plaza
Newark, NJ  07102
(973) 643-7000

By: s/ Jeffrey J. Greenbaum
    Jeffrey J. Greenbaum
    Stuart M. Feinblatt
    jgreenbaum@sillscummis.com
    sfeinblatt@sillscummis.com

**SHEARMAN & STERLING LLP**
Alan S. Goudiss
Daniel H.R. Laguardia
599 Lexington Avenue
New York, NY  10022
(212) 848-4000
agoudiss@shearman.com
dlaguardia@shearman.com

*Attorneys for the
Underwriter Defendants*

Dated:  May 14, 2012