Attorneys' Fees. . . " (Schering Decl. Ex. 2 at ¶ 8); *accord,* Ex. 3 ¶ 8 (LAMPER "fully supports"); Ex. 4 ¶ 8 (MissPERS "fully supports"); Ex. 5A ¶ 8 (OAG[25] "we support").

As members of the Schering Lead Plaintiff Group were involved throughout the case, have significant financial stakes in maximizing recovery, and owe fiduciary duties both to the class and to their various funds, we think their judgment on the performance of Plaintiffs' Counsel and the compensation to be provided to the lawyers they supervised in achieving a very impressive result warrants consideration. (*See,* discussion above, Section IV, 1. D: Weight, If Any, To be Accorded Views Expressed by the Lead Plaintiffs; *see also Lucent, 327 F. Supp. 2d at 440* ("Significantly, the Lead Plaintiffs, both of whom are institutional investors with great financial stakes in the outcome of the litigation, have reviewed and approved Lead Counsel's fees. . . . ").) The unanimous views of Lead Plaintiffs supporting the requested 16.92% of the Settlement Fund sought weighs heavily in favor of the fee request. *See Gunter, 223 F.3d at 199* ("[A] client's views regarding her attorneys' performance and their request for fees should be considered when determining a fee award.")

## 12. The Lodestar Cross-Check

In the Third Circuit, the lodestar of plaintiffs' counsel is used as a "cross-check" to test whether the fee that would be awarded under the POR approach is reasonable. *See Sullivan, 667 F.3d at 330; AT&T, 455 F.3d at 164.* In "cross-checking" the POR award against the lodestar, the Third Circuit has emphasized that the calculation is "not a full-blown lodestar inquiry" and need not entail "mathematical precision" or "bean counting". *AT&T, 455 F.3d at 169, n.6, quoting Rite-Aid, 396 F.3d at 306.* Accordingly, "the district court may rely on

---

[25] In the case of *Mass PRIMB*, the declaration supporting the requested fee award was made by an Assistant Attorney General on behalf of the Office of the Massachusetts Attorney General of the Commonwealth of Massachusetts ("OAG"). (Schering Decl. Ex. 5A.)

summaries submitted by counsel and need not review billing records." *Rite-Aid, 396 F.3d at 306-307.*[26]

Where, as here, a lodestar is utilized as a cross-check, the potential award under the POR approach is compared to the value of the billable time devoted to the case or "lodestar" To produce this ratio, the putative POR award is divided by the lodestar (which consists of the value of billable time devoted to the case calculated by multiplying the total hours submitted by counsel by the blended current billing rates of all attorneys and paraprofessionals who worked on the case). *(See AT&T, 455 F.3d at 169.)* When the multiplier yielded is very large, the lodestar cross-check serves the salutary purpose of alerting the trial judge to reconsider whether its POR calculation is reasonable. Conversely, where the ratio of the POR to the lodestar is relatively low, the cross-check can confirm the reasonableness of the potential award under the POR method .

Here, the summaries submitted by Plaintiffs' Counsel show an aggregate of 126,177.49 hours was spent on the prosecution and resolution of the Schering Action. (Schering Decl. ¶ 152.) Based on these summaries, the Schering Plaintiffs' Counsel lodestar is $59,450,367.00[27](derived by multiplying each firm's hours by the current hourly rates for attorneys, paralegals and other professional support staff).[28]

---

[26] Under the full "lodestar method," the number of hours each timekeeper spent on the case is multiplied by a reasonable hourly rate, and that "lodestar" figure is then adjusted by applying a multiplier to reflect such factors as the risk and contingent nature of the litigation, the result obtained and the quality of the attorney's work. The lodestar multiplier is intended to "account for the contingent nature or risk involved in a particular case and the quality of the attorneys' work." *Rite Aid, 396 F.3d at 305-06.*

[27] In keeping with the Third Circuit's determination that the "cross-check" does not involve "bean counting" or "mathematical precision," we have not fly-specked the summaries submitted by Plaintiffs' Counsel. Although Co-Lead Counsel did not attempt to substantiate the reasonableness of the billing rates charged, we have perused these rates and compared them against the 2012 *National Law Journal* ("NLJ") Annual Billing Survey, which samples law firm billing rates. The NLJ reports New York based law firm DLA Piper charges up to $1,200 per hour for partners and New York based law firm Kelley Drye & Warren charges up to $950 hourly per partner. Patton Boggs, based in Washington, D.C., charges $990 per hour and Locke Lord in Dallas charges
*(cont'd)*

52

The requested fee of 16.92% of the Settlement Fund, which would amount to

$80,031,600,[29] would yield an extremely modest multiplier of approximately 1.3, reflecting the

extensive time and effort demanded by this case. Thus, the "premium" or bonus over the billable

time actually devoted to the case produced by the POR method to compensate Plaintiffs' Counsel

for all the risks undertaken in this long, complex and uncertain case is only 30% of the value of

the time charges actually devoted to the case. Not surprisingly, this very low 1.3 multiplier is

well within the parameters allowed by courts throughout the Third Circuit and provides

compelling evidence that the requested attorneys' fee is reasonable. Indeed, lodestar multipliers

well above 1.3 and up to four are often used in common fund cases. *Prudential,* 148 F.3d at 341;

*see also AT&T*, 455 F.3d at 172 (approving a 1.28 multiplier and noting the Third Circuit's prior

"approv[al] of a lodestar multiplier of 2.99 in . . . a case [that] 'was neither legally nor factually

complex.'") (citation omitted); *In re Schering-Plough Corp. Enhance ERISA Litig.*, No. 08-1432,

2012 WL 1964451, at * 6 (D.N.J. May 31, 2012) (Cavanaugh, J.) (awarding 1.6 multiplier);

---

*(cont'd from previous page)*

$1,285 hourly for their highest charging partner. It has been widely reported from public bankruptcy records that as long ago as 2008-2009, partners at top New York law firms, including Paul Weiss Rifkind Wharton & Garrison and Sherman & Sterling, both of whom represent the Defendants in the Schering Action, were charging well over $1,000 per hour. *(See* A. Kotz, "Bankruptcy Rates Top $1,000 Mark in 2008-09," *American Lawyer*, December 16, 2009. ) Based on our limited unscientific review, we find no basis to conclude the rates contained in the summaries are inordinately high. Senior Partners at Co-Lead Counsel, including Max Berger (BLB&G), Jonathan Plasse (Labaton) and Lawrence Sucharow (Labaton) all charged hourly rates of $975. Messrs. Graziano (BLB&G) and McDonald (Labaton), the partners who managed the day-to-day litigation, charged $875 and $775 per hour, respectively. Mr. Cecchi's (CBCOB&A) billing rate of $750 per hour is lower than the top rate the NLJ reports is charged by the New Jersey-based Gibbons firm of $815.

28  In utilizing the blended billing rates to calculate the lodestar, the courts allow the use of <u>current</u> billing rates at the time the calculation is made rather than the billing rates actually in effect at the time the hours were recorded. Although counterintuitive, this is intended to compensate for delay in receiving fees. *Missouri v. Jenkins, 491 U.S. 274, 283-8 (1989); In re Enron Securities, Derivative & ERISA Litigation Conclusions of Law, Findings of Fact and Order re: Award of Attorneys' Fees, Fed. Sec. L. Rep. [2008 TRANSFER BINDER] ¶ 94,836 at 95,449(S.D. TX 2008); In re Rent-Way Securities Litigation, 305 F. Supp. 2d 491, 517, n. 10 (N.D. PA 2003); In re Ikon Office Solutions, Inc. Securities Litigation, 194 F.R.D. 166, 194 (E.D. PA 2000).*

29  The requested fee award would apply the 16.92% to the Settlement Fund *plus* interest earned on the fund. (Schering Decl. ¶ 16.) Our calculation does not reflect any interest.

*Lucent*, 327 F. Supp. 2d at 443 (awarding 2.13 multiplier in \$517 settlement); *DaimlerChrysler*,

No. 00-0993 (awarding 4.2 multiplier); *In re AremisSoft Corp. Sec. Litig.*, 210 F.R.D. 109, 135

(D.N.J. 2002) (awarding 4.3 multiplier); *In re Ikon Office Solutions, Inc. Sec. Litig.*, 194 F.R.D.

166, 195 (E.D. Pa. 2000) (awarding 2.7 multiplier and noting that it was "well within the range

of those awarded in similar cases").

We conclude the *Lodestar* cross-check confirms that the requested 16.92% POR

is reasonable and strongly supports Co-Lead Counsel's request.

## 13.    The Orloff Objection

The only objection to the Schering fee application is filed jointly by the Orloff

Family Trust d/t/d 12/13/01 and Dr. Marshall J. Orloff IRA (the "Orloff Objection") (S.ECF

338).[30] The basis for the Orloff Objection is hard to understand and harder still to reconcile with

well-established Third Circuit law.[31] The substance of the Orloff Objection[32] appears to consist

entirely of an attack on the lodestar of Plaintiffs' Counsel:

> "Plaintiffs' Counsel lodestar – which is derived by multiplying their hours
> by each firm's current hourly rates for attorneys, paralegals and other professional
> support staff is \$59,450,367.00. Accordingly, the requested 16.92% fee, which
> amounts to \$80,031,600, represents a modes multiplier of approximately 1.3."

---

[30]    The Orloff Objection also purports to lodge an objection to the Schering settlement itself, which the Objection asserts "is not fair to class members." As this issue is beyond the scope of our authority, we do not address this aspect of the Orloff Objection. We are, however, constrained to observe that the Orloff Objection is bereft of any indication, much less argument, as to why this settlement, which we conclude pursuant to the first *Gunter* factor is extremely impressive, is "not fair" or should be rejected.

[31]    It appears that the Orloffs and their attorney, Mr. Turkish, are professional objectors having submitted at least 10 objections in other recent securities class action settlements, including five this year alone. (*See* Schering Reply Memorandum of Law at 11 n.7; Reply Ex. 3.) As Lead Counsel points out, the Objection bears the erroneous caption of the "Southern District of New Jersey" suggesting it was carelessly marked-up from one of the objections the Orloffs have recently filed in the Southern District of New York. *(See Reply Ex. 3.)*

[32]    We are aware that Co-Lead Counsel contend the Orloff Objection fails to comply with the requirements for the submission of objections in the Court's Preliminary Order of Approval and, therefore, any objection by Orloff is waived. *(See* Schering Reply Memorandum at 11-12, n.8.) Because we believe that the Orloff Objection is so substantively flawed, we need not pause to consider this or other technical objections which are preserved, and remain available, should Orloff persist in trying to advocate his Objection further.

> The request is neither modes or reasonable. The court must engage in a detailed
> analysis of counsel's billing to determine the reasonable [sic] of the lodestar
> calculation. Under such an analysis the billed charges are unreasonably high.
> Further, there is no justification for using a 1.3 multiplier. In a settlement this
> large, percentages should not persuade; the court must award a reasonable fee
> based on the actual time and effort by counsel.

(Orloff Objection at 3-4.)

As we understand the gravamen of this Objection, it is that "the court must award a reasonable fee based on the actual time and effort by counsel." (Orloff Objection at 4.) In other words, the main contention in the Orloff Objection is that the fee award should be based on the lodestar method -- a position incompatible with well-settled controlling Third Circuit case law, none of which is even mentioned in the Orloff Objection. As Chief Judge Scirica stated in *Rite Aid, 396 F.3d at 306:* "[W]e reiterate that the percentage of common fund approach is the proper method of awarding attorneys' fees".

Of similar ilk is the assertion in the Orloff Objection that "The court must engage in a detailed analysis of counsel's billing. . . ." (Orloff Objection at 3.) As *Rite Aid* holds: "The lodestar cross-check calculation need not entail mathematical certainty nor bean counting. . . . and may rely on summaries submitted by the attorneys and need not review actual billing records." *396 F.3d at 306-307.* Indeed, "ultimately, the fact-intensive Prudential/Gunter analysis must trump all other considerations." *Sullivan, 667 F.3d at 331, n.64.* The Orloff Objection would substitute a full-blown lodestar method complete with a "detailed analysis of counsel's billing" for the fact intensive *Prudential/Gunter* analysis designed to provide a reasonable award under the POR method. In all events, even if the lodestar were more than a "cross-check", the *ipse dixit* assertion that a multiple of 1.3 "is neither modest or [sic] reasonable" (Orloff Objection at 3) is contrary to controlling precedent. *See, e.g., AT&T, 455 F.3d at 172.* "[W]e

55

think a multiplier of 1.28 is well within a reasonable range. . . . " For these reasons and more, we conclude the Orloff Objection lacks merit and should be rejected[33]

## B.   Co-Lead Counsel's Request for Reimbursement for Litigation Expenses

Co-Lead Counsel's fee application also seeks reimbursement for litigation expenses reasonably incurred in and necessary to the prosecution of the Schering Action in the amount of $3,620,049.63 . (Schering Decl. ¶¶ 170-78; Exs. 7A – 7E.)  In support, each of the law firms comprising Plaintiffs' Counsel has submitted a declaration attesting to the accuracy of their expenses along with a summary categorizing the type of expenses incurred and the amounts incurred in each category. (Schering Decl. Exs. 7A-7E.)

It is well established that the kind of expenses for which reimbursement is sought here may be properly recovered by counsel. *See Schering-Plough*, *2012 WL 1964451, at * 8. In re Safety Components, Inc. Sec. Litig.*, *166 F. Supp. 2d 72, 108 (D.N.J. 2001)* ("[c]ounsel for a class action is entitled to reimbursement of expenses that were adequately documented and reasonably and appropriately incurred in the prosecution of the class action" (*citing Abrams v. Lightolier, Inc.*, *50 F.3d 1204, 1225 (3d Cir. 1995)*); *Hall, 2010 WL 4053547, at *23* ("Courts have generally approved expenses arising from photocopying, use of the telephone and fax, postage, witness fees, and hiring of consultants.").[34]

---

[33]   Even though the filing of the Orloff Objection itself demonstrates the Motion for a Fee Award was accessible to Class members, the Orloff Objection complains, without any supporting evidence whatsoever, that "the fee motion was not posted on the settlement website". (Objection at 4.) As a factual matter, this *ipse dixit* assertion appears to be baseless as both the Motion for a Fee Award and Supporting Declarations were posted on the website on July 3, 2013. *(See* Supplemental Declaration of Stephan A. Thurin ¶ 7.) Nowhere does the Orloff Objection dispute that members of the class were made fully aware of the amount of fees being sought through the Notice Packets transmitted to them. Accordingly, we do not believe there is any basis to defer the objection deadline or final hearing as sought by the Orloff Objection. Our conclusion is fortified by the conspicuously low number of objections given the extremely large number of Notice Packets delivered to class members -- the Orloff Objection is the only objection received to the Schering fee application.

[34]   Many of the expenses were paid out of two litigation funds created by Co-Lead Counsel and maintained by BLB&G or G&E, Co-Lead Counsel in *Merck*. (*See* Schering Decl. ¶ 171; Exs. 9 and 10.) Co-Lead Counsel

*(cont'd)*

As to the amount of expenses, Co-Lead Counsel represents, "from the very beginning of the case, Co-Lead Counsel were well aware that they might not recover any of their out-of-pocket expenses until the Action was successfully resolved. Thus, Co-Lead Counsel were instructed to, and did, take significant steps to minimize expenses as much as practicable without jeopardizing the efficient prosecution of the case" (Schering Decl. ¶ 169.) Out of the total expenses, almost 80% were for outside experts and consultants $2,225,217 (61%) and document production copying costs ($624,873) (17%). (*See* Schering Decl. ¶¶ 172 to 173.)

We believe that the amount of expenses correlate best with the level of effort required, *i.e.*, the hours billed, to achieve the result, rather than the amount of the settlement.[35] Not surprisingly, Professors Eisenberg and Miller found the strongest associations between costs and hours. *See T. Eisenberg and G. Miller, "Attorneys' Fees and Expenses in Class Action Settlements: 1993 – 2008" at p. 26.* We observe here the ratio of expenses to the lodestar (value of time devoted) confirms that expenses are about 6% of the value of time which does not seem out of the ordinary or suggest expenses were too high.

We have also compared the litigation expenses requested here to NERA's statistics on the median expenses awarded in settlements of similar size in its *Recent Trends In Securities Class Action Litigation: 2012 Full Year Review at p. 34*. For settlements between $100 million and $500 million, the median expenses were 1.4% of the settlement value for settlements between 1996 and December 2009 and 1.2% of the settlement value for settlements

---

*(cont'd from previous page)*

    collectively contributed $2,389,500.00 to the Schering Litigation Fund and the Schering Litigation Fund contributed $515,000.00 to the Joint Litigation Fund. (Schering Decl. ¶ 171 .)

[35]   Comparing the expenses incurred to the size of the settlement, as some commentators have done, including NERA, seems to us less informative because enormous settlements can be achieved very quickly and ought to result in lower expenses, while a hard-fought lengthy litigation that produces a much lower settlement would be expected to generate far higher expenses.

between January 2010 and December 2012. Even though the Schering Action was extremely complex, protracted and involved massive discovery, the expenses of $3,620,049 are only .7% of the Settlement Fund which is well below the median expenses of between $5.6 million and $6.6 million. The litigation expenses are also way below the mean and median expenses found by Professors Eisenberg and Miller who analyzed all types of class action costs and expenses from 1993 to 2008. They found mean (average) costs from 1993 to 2008 were 2.8% of the recovery and the median costs were 1.8% and from 2003 to 2008 mean costs were 2.7% of recovery and median costs were 1.7%. *See T. Eisenberg and G. Miller, "Attorneys' Fees and Expenses in Class Action Settlements: 1993 – 2008" at 26.*

Each member of the Schering Lead Plaintiff Group supports the reimbursement request and attests that "the litigation expenses being requested for reimbursement to Co-Lead Counsel are reasonable and represent costs and expenses necessary for the prosecution and resolution of this complex securities fraud action. . . . " (Schering Decl. ¶ 7 of Exs. 2, 3, 4 and 5A.) No objection whatsoever has been filed to the portion of the fee application seeking reimbursement of litigation costs. *In re Par Pharmaceuticals, 2013 WL 3930091 (D.N.J. July 29, 2013); Lucent Technologies, Inc. Securities Litigation, 327 F. Supp. 2d 426, 463 (D. N.J. 2004.* These factors give additional comfort that the expenses for which reimbursement is sought are reasonable.

## C.     Request for Reimbursement of Costs and Expenses Incurred by Members of Lead Plaintiff Group

The members of the Schering Lead Plaintiff Group also seek reimbursement of costs and expenses in the aggregate amount of $102,447.26 incurred by them in their representation of the Class. Each member of the Schering Lead Plaintiff Group has submitted a declaration by a representative detailing the time and effort devoted to their roles as Lead

Plaintiff and the cost of their time, which could not be devoted to their other regular activities. (Schering Decl. ¶ 178; *see* Exs. 2, 3, 4 to 5B to Schering Decl.)

The Third Circuit favors encouraging class representatives, by appropriate means, to create common funds and to enforce laws – even approving "incentive awards" to class representatives.[36] *Sullivan, 667 F. 3d at 333, n.65.* Although the PSLRA specifically prohibits incentive awards or "bonuses" to Lead Plaintiffs, it specifically authorizes an "award of reasonable costs and expenses (including lost wages) directly relating to the representation of the class" may be made to "any representative party serving on behalf of a class." 15 U.S.C. § 77z-1(a)(4). Indeed, Congress explicitly acknowledged the importance of awarding appropriate reimbursement to class representatives. *See H.R. Conf. Rep. No. 369, 104th Cong., 1st Sess. 35 (1995)* ( "The Conference Committee recognizes that lead plaintiffs should be reimbursed for reasonable costs and expenses associated with service as lead plaintiff, including lost wages, and grants the courts discretion to award fees accordingly.")

Here, members of the Schering Lead Plaintiff Group, ATRS, MPERS, LAMPERS and MassPRIM, seek reimbursement of their costs and expenses in the amounts of $8,020.00, $39,080.00, $19,575.00, and $35,772.26, respectively. The amount of time and effort devoted to this action by the members of Lead Plaintiff Group is detailed in the accompanying declarations of their respective representatives. *(See Schering Decl. Exs. 2, 3, 4, 5B .)*

---

[36] In *Sullivan*, a non-securities case where incentive awards are not prohibited by statute as they are under the PSLRA, Judge Rendell writing for the Court of Appeals *en banc* specifically approved "the district court's decision to grant incentive awards to class representatives." The Court noted "Incentive awards are not uncommon in class action litigation and particularly where ... a common fund has been created for the benefit of the entire class. . . . The purpose of these payments is to compensate named plaintiffs for the services they provided and the risks they incurred during the course of class action litigation, and to reward the public service of contributing to the enforcement of mandatory laws." *(Sullivan,* 667 F.3d at 333, n.65.*)*

Reasonable payments to compensate class representatives for the time and effort devoted by them have been approved. *See In re Am. Int'l Grp. Inc. Sec. Litig.*, *2012 WL 345509, at \*6 (S.D.N.Y. Feb. 2, 2012)* ("Courts . . . routinely award . . . costs and expenses both to reimburse the named plaintiffs for expenses incurred through their involvement with the action and lost wages, as well as to provide an incentive for such plaintiffs to remain involved in the litigation and to incur such expenses in the first place." (citation and internal quotations omitted)); *In re Satyam Computer Servs. Ltd. Sec. Litig., No. 09-MD-2027-BSJ, slip op. at 3-4 (S.D.N.Y. Sept. 13, 2011)* (awarding a combined $193,111 to four institutional lead plaintiffs); *In re Marsh & McLennan Co. Inc. Sec. Litig., No. 04-cv-08144, 2009 WL 5178546, at \*21 (S.D.N.Y. Dec. 23, 2009)* (awarding a combined $214,657 to two institutional lead plaintiffs).

Here, members of the Schering Lead Plaintiff Group have collectively devoted more than 700 hours to the Action, which included time spent, *inter alia*: (i) reviewing pleadings and case materials; (ii) corresponding with Co-Lead Counsel about the status and strategy of the case; (iii) responding to document requests and producing more than 15,000 pages of documents; (iv) preparing for depositions and being deposed; and (v) preparing for, attending and participating in, multiple in-person mediation sessions and other settlement negotiations. *(Schering Decl. Exs. 2, 3, 4, 5B.)*

**D.      The Schering Recommendations**

In applying the various factors mandated by Third Circuit case law to determine whether under the POR method the fee award requested by Co-Lead Plaintiffs of 16.92% of the Settlement Fund is reasonable, we have attempted "to evaluate what class counsel actually did and how it benefitted the class." *AT&T, 455 F.3d at 165-66.* Based on our analysis of the *Gunter/Prudential* factors, we believe Co-Lead Counsel achieved an outstanding settlement for the Class which was due exclusively to Co-Lead Counsel's perseverance and skill in prosecuting

a very difficult and lengthy case without any assistance from restatements, criminal convictions

or companion SEC proceedings. Plaintiffs' Counsel undertook this case purely on a contingency

basis and accepted the significant risk that the enormous amounts of time and money they

invested in this case might not be recovered. The requested fee award is unanimously supported

by the four institutional members of the Lead Plaintiff Group and the lodestar "cross-check"

confirms that the award sought is reasonable. In light of the foregoing and for the reasons

discussed at length in the Report and Recommendation, we recommend the Court **GRANT** Co-

Lead Counsels' motion for an  award of attorneys' fees in the amount of 16.92% of the

Settlement Fund (including interest earned on the fund amount).

        We also recommend that the Court **GRANT** the motion of Co-Lead Counsel to be

reimbursed for expenses in the amount of $3,620,049.63.

        We also recommend that the Court **GRANT** the motion of Lead Plaintiffs to be

reimbursed for costs and expenses in the total amount of $102,447.26

**E.    The Merck Fee Application**

We now apply the reasonableness factors to the separate fee application by
Merck's Co-Lead Counsel which seeks attorneys' fees up to 28% of the Settlement Fund
(including interest thereon, reimbursement of litigation expenses in the amount of
$4,367,376.895 and reimbursement of members of the Merck Lead Plaintiff Group for costs and
expenses in the amount of $109,865.30

We recognize that the Merck and Schering Actions were different cases brought
on behalf of completely different Classes by a completely different Lead Plaintiff Group  and
involved different challenges and risks.  At the same time, however, overlap does exist between
these cases.  After all, the Merck and Schering Actions arose out of a nucleus of common fact,
were litigated in parallel, discovery was coordinated by Co-Lead Counsel in both cases, there
was overlap in the law firms comprising Co-Lead Counsel and Liaison Counsel in both cases,
and some expenses were shared through a Joint Litigation Fund.  (Schering Decl. ¶ 171.)  As a
result, the analysis of certain of the *Gunter/Prudential* reasonableness factors in the Merck
Action, such as the duration and complexity of the litigation and the skill and efficiency of the
attorneys involved, is similar to the Schering Action discussed at length above.[37]   In evaluating
the fee application by Co-Lead Counsel in the Merck Action, some comparisons between the
Schering and Merck Actions  are inevitable and we will take notice of  significant similarities
and differences where we believe it is appropriate and to do so will advance the analysis.

---

[37]   We hasten to add that while the Merck Lead Plaintiff Group and Co-Lead Counsel faced the challenges and the
complexity that were present in the Schering Action, as discussed below, there were a host of additional
challenges and risks in the Merck Action that were not present in the Schering Action.

62

### 1. The First Factor: Size of the Fund Created and the Number of Persons Benefitted

The Merck settlement created a $215 million cash Settlement Fund. It would be among the fifty largest securities class action settlements of all time, the seventh largest ever attained within the Third Circuit and the third largest securities class action settlement ever by a pharmaceutical company. (*See* Merck Decl. ¶ 8.) The creation of this very sizeable Settlement Fund is all the more impressive given the presence of very significant obstacles relating only to the Merck Action that Co-Lead Counsel needed to confront and overcome to achieve it, and the absence of factors traditionally contributing to increased settlement size, such as a financial restatement, criminal pleas by officers, a companion SEC enforcement action, an accounting firm defendant or Section 11 claim.

As we have already observed, the lack of any significant decrease in the price of Merck shares in the wake of the initial public disclosure on January 14, 2008 that Vytorin had failed the ENHANCE trial – while Schering stock plummeted losing approximately $3.5 billion in value -- was a potentially fatal vulnerability in the Merck Action. Not surprisingly, Defendants repeatedly attempted to exploit this possible "show stopper" throughout the Merck Action, including in their summary judgment motion, opposition to class certification, and in their attempt to obtain interlocutory review by the Third Circuit of the Court's Order certifying the class.

Ironically, as Co-Lead Counsel successfully surmounted each of these potentially dispositive attacks and thereby moved the Merck Action along the path toward success, they also significantly increased their own financial risk. Viewed purely from the perspective of Merck Co-Lead Counsel's financial risk, losing their investment of time and expenses expended at the motion to dismiss stage is bad enough – but losing at the summary judgment stage after four

63

years of litigation and massive discovery is vastly more costly -- and losing at trial or on appeal is even worse. Undaunted, Merck Co-Lead Counsel persevered to the verge of trial refusing to acquiesce to any settlement that they believed failed adequately to compensate the Class -- just as they would be expected to do.

Measured against investor losses on January 14, 2008, when the Vytorin lack of success in the ENHANCE trial was first publicly disclosed -- which were zero – the settlement achieved in the Merck Action is literally incomparable. Indeed, on January 14, 2008, any Merck shareholders for whom Vytorin's success in the ENHANCE trial was material to their investment decision could have sold without incurring any financial loss.

Even measured against the much more problematic investor losses sustained more than two months later, on March 31, 2008, when Merck shares lost $14 billion in value, the $215 million settlement represents more than 1.5% of these investor "losses". According to NERA's analysis, the median settlement value of cases in which investor losses exceed $10 billion is only .7%. *NERA, Recent Trends in Securities Class Action Litigation: 2012 Full Year Review at p. 32.* For a case where investor losses were $14 billion, the median settlement would be about $98 million. Accordingly, the $215 million Settlement Fund is more than twice the median settlement for investor losses of this size.

There is also no doubt that an enormous number of Merck investors will benefit from the settlement. As of July 1, 2013, 729,295 Settlement Notice Packets were sent to potential class members. (Merck Decl. ¶ ¶ 126, 151; Ex. F , Decl. of Stephanie A. Thurin ¶ 8.) Thereafter, 26,873 additional Settlement Notice Packets were mailed to class members for a cumulative total of 758,388 as of August 12, 2013. (Suppl. Decl. of Stephanie A. Thurin ¶ ¶ 3, 4.)

Thus, we conclude that the size of the Settlement Fund achieved by Merck's Co-Lead Counsel is an outstanding result, especially in light of the extremely significant difficulties and risks presented by the case. We believe this factor weighs heavily in favor of the suggested fee award.

### 2.    The Second Factor: Number Of Objections By Class Members

For the second *Gunter* factor, "the Court evaluates the presence or absence of substantial objections by members of the class to the settlement terms and/or fees requested by counsel." *Merck ERISA*, 2010 WL 547613, at \*10.  As of July 1, 2013, class members had been sent 725,295 settlement notice packets (Merck Decl. ¶¶ 126, 151) apprising them Co-Lead Plaintiffs on behalf of Plaintiffs' Counsel would apply to the Court for an award of attorneys' fees not to exceed 28%. (Merck Decl. Ex. A, p. 2 to Ex. F.)  Accordingly,  the Class Members were fully informed of the amount Co-Lead Counsel would seek as attorneys' fees. *See Lucent, 327 F. Supp. 2d at 435, n. 10.*

The deadline for filing objections expired on August 5, 2013. (Merck Decl. ¶ 123.)  We understand that only two objections to the amount of fees sought by Merck Co-Lead Counsel were received (Lead Plaintiffs' Memorandum of Law in Response to Objections at 1) -- an exceptionally low number of objections.  Even though the Merck shareholder base consists of a substantial number of institutional holders – not a single institution objected to Co-Lead Counsel's fee request. (Merck Lead Plaintiff Memorandum in Response to Objections at 2-3, n.2.)  In the words of the Court of Appeals decision in *Rite Aid*, which is squarely in point:

> The class's reaction to the fee request supports approval of the requested fees. Notice of the fee request and the terms of the settlement were mailed to 300,000 class members, and only two objected. *We agree with the District Court such a low level of objection is a "rare phenomenon." Id. at 610.* Moreover, as the court noted, a significant number of investors in the class were "sophisticated" institutional investors that had considerable financial incentive to object had they believed the requested fees were excessive. *Id. at 608 and n. 5.* The District Court

did not abuse its discretion in finding the absence of substantial objections by
class members to the fee requests weighed in favor of approving the fee request.

*396 F.3d 309 (emphasis supplied).* The filing of only two objections here, both in our view

lacking in merit (as discussed below), neither by an institution, constitutes an equally "rare

phenomenon" and overwhelmingly supports the Merck Fee Application.

### 3.     The Third Factor: The Skill and Efficiency of Co-Lead Counsel

Like Co-Lead Counsel in the Schering Action, Co-Lead Counsel in the Merck

Action are at the top of the Plaintiffs' Securities Class Action Bar. Indeed, both G&E and

BLB&G, which is Co-Lead Counsel in both cases, have platinum reputations and records of high

achievement in securities class actions.

The quality of their work in this case was especially impressive. Co-Lead

Counsel fought this very complex, difficult and extremely risky case for almost five years. In the

process, they successfully overcame Defendants' opposition to class certification, resisted

Defendants' motions to dismiss, for summary judgment, and for interlocutory appeal to the Third

Circuit from this Court's order granting class certification. In achieving these results and

preparing the case for trial, Lead Counsel were required to master a host of complex issues,

including protocols for clinical trials, the science behind the drugs at issue, and the complex

statistical principles needed to prove that Defendants improperly unblinded the ENHANCE data

and learned the trial results long before publicly disclosing them. *See Rowe*, 2011 WL 3837106,

at \*20 (finding that "complex issues raised in [the] litigation required counsel with numerous

areas of expertise. . . . [including] specialized understanding of on-going scientific, regulatory,

political/legislative and legal developments").

Defendants' counsel in this case were top attorneys from highly respected law

firms who mounted a ferocious defense. The high quality and vigor of defense counsel bears on

the evaluation of the quality of services rendered by Class Counsel. *See, e.g., In re Warner Commc'ns Sec. Litig.*, 618 F. Supp. 735, 749 (S.D.N.Y. 1985) ("The quality of opposing counsel is also important in evaluating the quality of Lead Counsels' work.").

In the final analysis, Co-Lead Counsel fielded a team that convinced Merck's very accomplished defense team and sophisticated clients that they were ready, willing and able to try this very complex and very risky case to verdict and that a sufficient chance existed that a very large verdict in favor the Class would be returned that Defendants were willing to pay $215 million to settle the Merck Action and forego pursuit of their very formidable legal and factual defenses.

In the context of this lengthy and contentious case, the equivalent of a legal brawl, the Merck Co-Lead Counsel were as efficient as possible. They used highly advanced technology to manage the twelve million documents and coordinated with Co-Lead Counsel in the Schering Action to maximize the litigation effort and attempt to avoid duplication. (*See* Merck Decl. ¶ ¶ 60, 64.) In the end, they succeeded in obtaining a very large recovery for Class Members in the face of very substantial risks of recovering nothing. *See, e.g., In re Ins. Brokerage Antitrust Litig.*, 282 F.R.D. 92, 121 (D.N.J. 2012) ("The substantial settlement sum negotiated by Class Counsel . . . further evidences their competence"). We conclude the skill and efficiency of Co-Lead Counsel strongly support the suggested fee award.

### 4. The Fourth Factor: Complexity and Duration

The fourth *Gunter* factor requires examination of the complexity and duration of the litigation. As this Court previously has observed, by nature "securities class actions are inherently complex." *Louisiana Mun. Police*, 2009 WL 4730185, at *8 (D.N.J. 2009) (Cavanaugh, J.). Here, this complexity was compounded by the medical and scientific issues necessary to understand clinical trial protocols and the science behind the drugs at issue, and the

statistical analyses that Co-Lead Counsel were required to learn to effectively prosecute their claims. Beyond the complicated subject matter, numerous legal obstacles confronting the Merck Co-Lead Counsel pervaded the case and required exceptional effort and skill to maneuver around them – especially the extremely significant legal challenges posed by the failure of Merck's shares to decline appreciably in response to the January 14, 2008 disclosures, which Defendants pressed at every opportunity.

This complex and hotly-contested securities fraud litigation lasted for nearly five years and epitomizes the kind of drawn out and complicated case contemplated by the fourth *Gunter* factor. This *Gunter* factor also strongly supports Co-Lead Counsel's fee application. *See Schering-Plough ERISA*, *2012 WL 1964451, at \*7* ("This is a significantly complex litigation that has been ongoing for four years. This factor weighs in favor of an award of attorneys' fees".); *Merck ERISA*, *2010 WL 547613, at \*10* ("inherently complex suit" that was "ongoing for more than two years" warranted fee award).

### 5. The Fifth Factor: The Risk of Non-Payment

In applying the *Gunter/Prudential* factors, the Third Circuit has made clear that "each case is different, and in certain cases, one factor may outweigh the rest." *Gunter, 223 F.3d at 195, n.1. Accord, AT&T, 456 F.3d at 166; Rite Aid, 396 F.3d at 301.* We believe the fifth *Gunter* factor, the risk of non-payment, is particularly significant in the Merck Action. *See Esslinger v. HSBC Bank Nevada, N.A., No. 10-cv-3213, 2012 WL 5866074, at \*13 (E.D. Pa. Nov. 20, 2012)* ("This [risk of non-payment] factor allows courts to award higher attorneys' fees for riskier litigations"); *In re Pet Food Prods. Liab. Litig., No. 07-cv-2867, 2008 WL 4937632, at \*22 (D.N.J. Nov. 18, 2008), aff'd in part, vacated in part on other grounds, 629 F.3d 333 (3d Cir. 2010)* ("Courts have consistently recognized that the risk of receiving little or no recovery is a major factor in considering an award of attorneys' fees").

Plaintiffs' Counsel undertook this action on an entirely contingent fee basis, knowing they very likely would be committing to a very complex, lengthy and expensive battle that carried an extreme risk that the litigation would yield no, or very little, recovery and leave them uncompensated for their huge investment of time, as well as for their significant out-of-pocket expenses. (Merck Decl. ¶ 145-147.) As things transpired, there existed an very large chance that Plaintiffs would recover nothing, despite having devoted enormous amounts of time and money to five years of contentious litigation and taken the case to the eve of trial.

### (a) The Risk In Establishing Loss Causation and Damages

From the inception of the Merck Action through the settlement, the Merck Lead Plaintiff Group and the Plaintiffs' Counsel were faced with a potentially fatal obstacle. As a matter of law, Plaintiffs would have to prove their losses on their Merck investments were proximately caused by Defendants' fraud *(e.g.,* the concealing of material information – the ENHANCE results). *Dura, 544 U.S. at 341-42.* Standing between the Merck Lead Plaintiff Group and this indispensable element of their claims was the acknowledged fact that Merck's stock did not drop by a statistically significant amount on January 14, 2008 when the "top line" ENHANCE results were publicly disclosed. On that day, Merck and Schering announced that Vytorin did not outperform Zocor and Schering's stock price plunged significantly, losing $3.5 billion in value while Merck's stock barely moved. Accordingly, Plaintiffs faced a stark prospect of not being able to establish loss causation, and thus recovering nothing. *Semerenko v. Cendant Corp., 223 F. 3d 165 (3d Cir. 2000). In Semerenko, t*he Third Circuit stated "where the value of the security does not actually decline as a result of our alleged misrepresentation, it cannot be said that there is in fact an economic loss attributable to that misrepresentation. In the absence of a correction in the market price, the cost of the alleged misrepresentation is still

69

incorporated into the value of the security and may be recovered at any time simply by reselling the security at the inflated price." *Id., 233 F. 3d at 185.*

To be sure, the Merck Co-Lead Counsel fought hard to overcome this potentially fatal problem arguing that the January 14, 2008 announcement of the ENHANCE results was not a complete disclosure of the alleged fraud and that, following that announcement, Merck officers made additional false and misleading statements in furtherance of the fraud. Plaintiffs' theory was that critical new information about the ENHANCE results was disclosed on March 30, 2008, at the American College of Cardiology ("ACC") conference. Throughout the Merck Action, Defendants vehemently argued that since the January 14, 2008 announcement disclosed that the ENHANCE trial had failed, that announcement fully cured any alleged fraud. Indeed, at the time of the settlement, briefing on Defendants' latest attempt to exploit this issue – their motion to exclude any expert testimony by Dr. Greg Jarrell as to any injury subsequent to January 14, 2008 -- was almost complete and could have demolished the case. In short, Merck Lead Plaintiff and Co-Lead Counsel faced a huge risk that a jury, the judge or the Third Circuit on appeal, would agree with Defendants and that they would recover nothing.

### (b) The Risk In Proving Defendants' Scienter

Other challenges abounded. Like the Schering Lead Plaintiff, the Merck Lead Plaintiff would have had to show that more than a year before Defendants disclosed the results of the ENHANCE trial, the Merck Defendants reviewed the trial data and applied statistical analyses which revealed that the trial had failed. As we observed in the Schering Fee Application, this was no easy task for Schering Co-lead Counsel because no Defendant ever admitted wrongdoing nor was subject to criminal or other governmental sanctions and the Schering scientists were well down the corporate ladder from the senior officers. But, the proof was far more difficult in the Merck Action because the ENHANCE trial was run by Schering,

70

not Merck. As a result, the difficulties in establishing these facts (and Defendants' *scienter*)

were greater for Merck's Co-lead Counsel because (i) all the trial data was maintained by

Schering employees; (ii) Schering, not Merck, statisticians engaged in the purported early review

and statistical analysis of the trial data; and (iii) the purported communication of the news of the

trials' failure from Schering to Merck occurred during a meeting where the CEO of Schering (if

it could ever be shown he had received the information) communicated it to the CEO of Merck

for which there was no documentation concerning the substance of the meeting  nor any

corroborating testimony.  In short, Lead Plaintiffs in the Merck Action  had no "smoking gun"

and a much harder road to hoe than the Schering Plaintiff Group.

            The Third Circuit Task Force on Selection of Class Counsel explained the very

important link between the significant risk faced by Class Counsel and compensating Class

Counsel for accepting this risk with a "premium" for success:

> It is plaintiffs' counsel who work to obtain whatever recovery any member of the
> class who has not opted out of the litigation will receive. The fact that there will
> be no payment if there is no settlement or trial victory means that there is greater
> risk for plaintiffs' counsel in these class action cases than in cases in which an
> hourly rate or flat fee is guaranteed. The *quid pro quo* for the risk, and for the
> delay in receiving any compensation in the best of circumstances, is some kind of
> risk premium if the case is successful.

*74 Temple L. Rev. 689, 691-692 (2001) (footnote omitted).*

            We believe the extremely substantial risk of non-recovery in the Merck Action

weighs heavily in favor of the fee application. See T. Eisenberg and G. Miller, "Attorneys' Fees

and Expenses in Class Action Settlements: 1993 – 2008 at 18; (2009) Cornell Faculty Working

Paper 64 at p. 11. *("[S]tandards applied to attorney fees uniformly indicate that greater risk*

*warrants an increased fee. . . courts systematically reward risk. . . and [t]he difference within a*

*case category between high risk cases and other cases was statistically significant only for the*

*large Securities category.")(Emphasis supplied.)*

### 6.   The Sixth Factor: Amount of Time Devoted By Plaintiffs' Counsel

Given the complexity and five-year duration of the Merck Action, and the scorched-earth defense mounted by top-notch defense counsel, it is by no means surprising Merck Plaintiffs' Counsel devoted enormous time and effort to the Merck Action – the case demanded it. Since its inception, Plaintiffs' Counsel expended 105.341.76 hours – valued at approximately $45 million (as calculated for purpose of the lodestar) (*see* Merck Decl. ¶ 136; Ex. M). The enormous time and effort devoted by Plaintiffs' Counsel, necessitated by the magnitude and complexity of the case, which was at high risk throughout the Merck Action, also strongly supports the suggested fee award.

### 7.   The Seventh Factor: Awards in Similar Cases

The Co-Lead Plaintiffs' suggestion that we recommend an award of 28% of the Settlement Fund would place the fee award toward the higher end of the spectrum of fee awards in settlements of this size. Whether the suggested POR is justified depends on an evaluation of ta number of variables.

In *Sullivan*, the Third Circuit considered the propriety of awarding attorneys' fees of 25% of the $293 million Settlement Fund. There, an objector contended the fee award was unjustified by the Court of Appeals jurisprudence arguing "this being a default judgment case, which entailed minimal motions practice and discovery." *667 F.3d at 329.* There, where "the Special Master and District Court observed that counsel devoted nearly 39,000 hours to litigating this matter . . . " -- less than 40% of the time devoted by Plaintiffs' Counsel here -- the Court rejected the objection stating, in salient part, "[w]e find no abuse of discretion in the District Court's conclusion that the complexity and duration of the litigation supported the requested fee." *(Id. at 331.)*

In applying this seventh *Gunter* factor -- comparing the award to awards in

similar cases -- the Court of Appeals in *Sullivan* stated:

> Finally, the objectors' assertion that the award improperly exceeds the awards in similar cases is equally unavailing. In *Cendant PRIDES*, we discussed fee awards in class actions in which the settlement fund exceeded $100 million and which relied upon the POR method, finding that "the attorneys' fee awards ranged from 2.8% to 36% of the total settlement fund." *243 F.3d at 737.* Similarly, in *Rite Aid*, we found no abuse of discretion in a district court's reliance on three studies that demonstrated an average percentage fee recovery in large class action settlements of 31%, 27–30%, and 25–30%. *396 F.3d at 303.* Here, the District Court determined that the 25% fee requested by counsel fell within this range. (App'x 320.)

*(Id. at 332-333.)*

Although *Sullivan* was an antitrust case, the Court of Appeals relied on *Rite Aid*,

which sustained the district court's application of *Gunter's* seventh factor as favoring approval of

a 25% POR award of a $126 million Settlement Fund. Relying on three studies of class action

settlements, the Court in *Rite Aid* stated:

> In comparing this fee request to awards in similar cases, the District Court found persuasive three studies referenced by Professor Coffee: one study of securities class action settlements over $10 million that found an average percentage fee recovery of 31%; a second study by the Federal Judicial Center of all class actions resolved or settled over a four-year period that found a median percentage recovery range of 27-30%; and a third study of class action settlements between $100 million and $200 million that found recoveries in the 25-30% range were "fairly standard." Id. at 610. We see no abuse of discretion in the District Court's reliance on these studies.

*Rite Aid, 396 F.3d 294, 303.*

NERA's most recent study of attorneys fee awards in securities class actions

shows that for settlements between $100 million and $500 million, the median attorneys' fee

award for the period January 1996 to December 2009 was 22.8% and for the most recent two-

year period from January 2010 to December 2012, the median attorneys' fees award was 18.2%.

*NERA, Recent Trends in Securities Class Action Litigation: 2012, Full Year Review at January*

*29, 2013 at p. 34.* As NERA notes, "typically fees and expenses grow with settlement size but

less than proportionately, *i.e.*, the percentage fees . . . shrink as the settlement size grows." *(Id.*

*at 34.)* Given the extremely broad – and possibly overly inclusive -- settlement range used by

NERA, and the inverse correlation between the settlement size and the percentage awarded, it is

reasonable to believe the median percentage would increase at the lower end of the $100 million

to $500 million range, which is where the $215 million would be situated. At the $25 million to

$100 million settlement range, the median is 28.8% for settlements between January 1996 and

December 2005 and 25% for the period January 2010 to December 2012. This suggests that the

median for settlements between $100 and $300 million would lie between the two ranges.

Significantly, the Court of Appeals in *Sullivan* emphasized that application of the

"awards in similar cases," seventh *Gunter factor,* does not involve simplistic comparisons or

"formulaic applications of the appropriate range":

> We are cognizant that a comparison of this award to fees ordered in other
> cases is a complex analytical task, in light of variations in the efforts exerted by
> attorneys and the presence of complex legal and factual issues. That said, we have
> emphasized "that a district court may not rely on a formulaic application of the
> appropriate range in awarding fees but must consider the relevant circumstances
> of the particular case." *Cendant PRIDES, 243 F.3d at 736.*

*Sullivan* 667 F.3d 273, 333).

Applying this criteria, Judge Rendell observed: [A]lthough this case may have

lacked some of the contested motion practice and extensive discovery elicited in some of the

other cases receiving similar percentage awards, the case presented other challenges. . . ." *(Id. at*

*333, citations omitted.)* Thus, the Court of Appeals sustained the 25% fee awarded, holding:

> [T]he District Court here properly considered the relevant *Gunter* and
> *Prudential* factors, and determined that the case presented all of the factors we
> had recognized as supporting a higher award: "complex and/or novel legal issues,
> extensive discovery, acrimonious litigation, and tens of thousands of hours spent
> on the case by class counsel." (App'x 320 (*quoting Cendant PRIDES, 243 F.3d at*
> *741).)*

The Merck Action involved all the factors the Court of Appeals recognized as supporting higher awards. Complex and novel legal issues permeated the case, there was extensive discovery and more than a hundred thousand hours were spent on a case that epitomized "acrimonious litigation". Unlike *Sullivan*, which may have "lacked some of the contested motion practice and extensive discovery," *667 F.3d 333,* the Merck Action featured extensive motion practice – dismissal, summary judgment, class certification, interlocutory review and *in limine* motions, and involved massive discovery involving review, assimilation and analysis of 12 million pages of documents and the depositions of 45 witnesses.

Given the vast range of attorneys' fee awards in class actions, including securities class actions settling at levels exceeding $100 million, each of which depended on weighing numerous variables impacting the particular decision, it is difficult, if not impossible, to liken the Merck Action to an identical case. Certain observations, however, can be made.

The suggested attorneys' fee award of 28% of the Settlement Fund is within the broad range of awards identified in *Cendant PRIDES* and also well within the ranges of studies of fee awards subsequently referred to by the Court of Appeals in both *Sullivan* and *Rite Aid.* The suggested award, however, would be exceed the median attorneys' fee award observed by NERA in settlements of this size. However, this simply means that the award would be among the 50% of fee awards falling above the "median," which by definition is the point at which that half the fee awards will fall below the "median" and half will exceed the "median".

Giving weight to the factors the Third Circuit in *Sullivan* "recognized as supporting a higher award: 'complex and/or novel legal issues, extensive discovery, acrimonious litigation, and tens of thousands of hours spent on the case by class counsel'" *(Sullivan 667 F.3d at 333),* we find them all present in the Merck Action. In addition, however, we also believe that

75

the extremely risky nature of the Merck Action combined with the magnitude of the endeavor

undertaken by Plaintiffs' Counsel in the Merck Action which would, and did, require an

enormous investment of time and money on a purely contingent basis, more than two and one

half times the hours expended in *Sullivan* -- unaided by any other contributing factors like

indictments or restatements that would be expected to enhance the likelihood of recovery --

strongly supports "a higher award" in the Merck Action. As in *Sullivan*, "the risk of nonpayment

remained ever-present throughout the litigation and settlement proceedings." *667 F.3d at 332.*

Indeed, it remains unclear to the end, whether the Merck Action ultimately could have survived

the January 14, 2008 disclosures – a Sword of Damocles that again was raised by Defendants' *in*

*limine* motion seeking to preclude testimony by one of the key plaintiffs' experts as to any post

January 14, 2008 damage that was on the verge of submission when the case was settled .[38]  On

balance, we believe the seventh *Gunter* factor also supports the suggested fee award.

### 8.    The Eighth Factor: Were the Benefits Acquired from the Efforts of the Class-Counsel or Others

As is true in the Schering Action, the record in the Merck Action compels the

conclusion that all the substantial benefits accruing the Merck Class derived exclusively from the

herculean efforts of Plaintiffs' Counsel. As we have already observed, there was no one else on

the scene that could have contributed to, much less produced, the result here – no government

agency or corporate litigant led the charge, no restatement or criminal conviction provided aid or

---

[38]    Given this Court's previous rulings, including its holding on class certification that it would be premature to decide this issue, we recognize it would be reasonable for Merck Co-Lead Counsel and Defendants' Counsel to expect the motion to be denied . But that would merely have forestalled, not disposed of, this critical legal overhang. Certainly, an enormous risk existed that the jury, the Court on post-trial motions or the Third Circuit could decide that causation, damages and/or materiality were foreclosed by the admitted failure of Merck's share price to react when the basic information about Vytorin's performance in the ENHANCE trial was disclosed on January 14, 2008.

leverage. In short, we conclude the Settlement Fund is the product solely of the efforts of

Plaintiffs' Counsel and this weighs heavily in favor of the suggested fee award.

### 9.     The Ninth Factor: The Amount That Could Be Negotiated in a Private Contingency Fee Agreement

As we noted in applying this factor in the Schering Action, a number of courts

within the Third Circuit have observed attorneys regularly contract for contingent fees between

30% and 40% with their clients in non-class commercial litigation. Although the suggested Fee

Award compares favorably to the private contingency fee levels, for the reasons discussed in the

Schering Fee Application, we accord this factor little weight.[39] *(See note 24, supra.)*

### 10.     The Tenth Factor: Innovative Factors in the Settlement

Like the Schering Action, the terms of the settlement are plain vanilla involving

cash in exchange for releases and is a neutral factor.

### 11.     An Additional Factor: The Views of Lead Plaintiff Group Members

### (a)  The Merck Lead Plaintiff Group

At the inception of the case, the four institutions, ADP, IFM, Jacksonville and

Detroit, determined to join together to form a group they denominated as the "Institutional

Investor Group" to seek appointment under the PSLRA as a Group Lead Plaintiff. By forming

the Institutional Investor Group, the members were able to aggregate their losses and enhance

their likelihood of having the "largest financial interest in the relief sought by the class" in the

Merck Action and thereby becoming the "presumptive" lead plaintiff. *See* 15 U.S.C. §

---

[39]     As we discuss in detail in the next session, ABP, a member of the Merck Lead Plaintiff Group, negotiated an individual fee agreement with G&E, one of the Merck Co-Lead Counsel containing a fee arrangement limiting G&E's fee to 15% of the first $500 million recovered in a class action that contemplated a single Lead Plaintiff and only one Lead Counsel to share the fee award.. As the agreement contemplated a class action not an individual private action, and one not involving a group lead plaintiff or co-lead counsel sharing the fee -- we address it below in Section 11(b).

78u(a)(3)(B)(iii). Not surprisingly, in the Memorandum of Law filed by the Institutional

Investor Group in support of, among other relief, their appointment as Lead Plaintiff, they relied

on the cumulative loss suffered by the four members: "[t]he Institutional Investor Group,

*combined,* purchased over 6.9 million shares of Merck stock suffering losses of $38,390,726 in

connection with its transactions." (Memorandum of Law in Support of Institutional Investor

Group's Motion for Appointment as Lead Plaintiff at 2; emphasis supplied); *see also Id. at 15*

("[T]he Institutional Investor Group believes that it has a greater financial interest in this action

than any other class member who has come forward by virtue of its approximate losses of over

$38 million.") In its July 2, 2008 Order, this Court appointed each member of the Institutional

Investors Group as Lead Plaintiff.

It was the entire Lead Plaintiff Group, not any one member acting alone, that

retained Co-Lead Counsel. In the Motion to be Appointed as Lead Plaintiff, the Institutional

Investor Group requested the Court to approve the counsel retained by the "Group". In support

of the Institutional Investor Group's selection of counsel, the Group represented "*[t]he*

*Institutional Investor Group retained counsel* to represent the class, subject to the Court's

approval. This Court should not disturb Lead Plaintiffs' choice. . . ." *(Id. at 15; emphasis*

*added.)* It further states: "[I]n that regard, *the Institutional Investor Group has selected and*

*retained* the law firm of Grant & Eisenhofer and Bernstein Litowitz Berger & Grossman LLP as

Co-lead Counsel, and Carella Byrne and Seeger Weiss as Co-Liaison Counsel, for the Class."

*(Id.; emphasis supplied.)*

Each of the four institutional members of the Merck Co-Lead Plaintiff Group has

submitted a declaration supporting the settlement. As to the Co-Lead Counsel's Fee Application,

three of the four members fully support an attorneys' fee award of 28% of the Settlement Fund.[40]

(Merck Decl. ¶ 130.) As Lead Plaintiff member IFM stated in its accompanying declaration,

"IFM fully supports a fee award of 28% of the Settlement Fund, which takes into account the

hard fought nature and long history of the case, the excellent results achieved and the substantial

risks that Class Counsel undertook pursuing these difficult claims." (IFM Decl. ¶ 13; Ex. C to

Merck. Decl.) In its declaration, Lead Plaintiff member Jacksonville echoed this view: "[I]n a

case of this magnitude and degree of complexity where counsel has demonstrated superior skill

and ability, Jacksonville P&G believes a fee of 28% is a reasonable fee award. Jacksonville has

authorized counsel to present this fee request to the Court. . . . " (Ex. D, ¶ 16.) In expressing this

view, Lead Plaintiff Jacksonville specifically stated, among other reasons, the substantial

recovery obtained for the class . . . would not have been possible without the tremendous efforts

of Co-Lead Counsel." (*Id. at ¶ 7.)* Finally, Detroit, a member of the Merck Lead Plaintiff

Group, also states "a fee of 28% is a reasonable attorneys' fee award." (Ex. E, ¶ 6.)

           The remaining member of the Merck Lead Plaintiff Group is ABP. In a

declaration submitted on behalf of ABP, it states:

> ABP's retainer with G&E, which was entered before joining with Co-Lead
> Plaintiffs and Co-Lead Counsel, contains a provision capping G&E's attorneys'
> fees at 15% of any recovery by settlement or judgment of up to $500 million.
> ABP has also been made aware of the time and expenses incurred by other Co-
> Lead Counsel.  ABP understands that Court-appointed Special Masters (Mr.
> Greenberg and Mr. Lerner) have been charged to review the applications for
> attorneys' fees and expenses, and to file with the Court a report and
> recommendation that determines what they conclude is the amount of attorneys'
> fees and expenses that should be awarded to Class Counsel.  In light of this
> procedure established by the Court, ABP will not now take a position on the
> specific amount of attorneys' fees that should be awarded; rather ABP will await

---

[40] According to the Merck Co-Lead Counsel's Memorandum of Law, the 28% suggested fee award was the
product of discussions with the members of the Merck Lead Plaintiff Group: "Co-lead Plaintiffs requested that
Plaintiffs' Counsel not seek a fee greater than 28% of the Settlement Agreement and Lead counsel agreed."
(Merck Lead Plaintiffs' Memorandum of Law at 18.) Merck does not mention or illuminate this discussion.

the report and recommendation of the Special Masters and evaluate that recommendation when it is made, but expects it will defer to the Special Masters.

(Merck Decl. Ex. B ¶ 13.)

### (b) The Effect, If Any, of the G&E Retainer Letter

We do not believe the 15% fee cap in the individual retainer letter between ABP and G&E can, or should, control the amount of fees to be awarded to Plaintiffs' Counsel in the Merck Action. On its face, the letter is only between G&E and ABP, and specifically provides that "ABP will seek to be Lead Plaintiff". It is only "if ABP is successful in obtaining Lead Plaintiff designation that 'G&E will request and ABP will support a fee of 15 percent up to $500 million. . . . '" Thus, neither the letter nor the fee agreement appears to contemplate the Group appointment that ultimately occurred or the appointment of Co-Lead Counsel.[41] *(Compare Cendant I, 264 F.3d at 224, n.4 ("The retainer agreement declared to members of the Group have agreed to proceed together to seek Co-Lead Plaintiff position"* and states *the funds, if selected, will seek the appointment of BRB and BLBH as co-lead counsel.")*

As ABP acknowledges, the Retainer Agreement with G&E "was entered before joining with the Co-Lead Plaintiffs and Co-Lead Counsel".[42] None of the other members of the Institutional Investor Group – which retained Co-Lead Counsel -- nor the other law firms comprising Plaintiffs' Counsel, including Co-Lead Counsel BLB&G, are signatories to the G&E engagement letter or bound by it. According to its submission to the Court, the members of the Institutional Investors Group *collectively* retained Co-Lead Counsel and Liaison counsel and

---

[41]  In this context, we construe the reference in the retainer letter to G&E's "attempting to get other counsel to agree to the proposed fee schedule," as referring to local New Jersey liaison counsel and any other that might work on behalf of G&E as sole lead counsel.

[42]  The retainer letter was executed on May 29, 2008, five days before the Institutional Investor Group made its submission reflecting ABP's joinder with the other members of the Lead Plaintiff Group and retention of Co-Lead Counsel.

requested the Court to defer to the Group's decision. Here, the three other members of the Institutional Investors Group support a fee award of 28% made by Co-Lead Counsel on behalf of all Plaintiffs' Counsel.

Significantly, APG (which acted for ABP) also attests it was kept abreast of the time and money G&E devoted to the case on a monthly basis and expresses the view that the 59,593 hours of time expended by G&E's lawyers and paralegals, which created a lodestar value of $24,634,856 over the five years the case was prosecuted, "was reasonable, and necessary to prosecute the action and achieve the result." (Merck Decl. Ex. B, ¶ 11.) ABP also appears to recognize that the fee award should be decided based on an evaluation of the relevant factors stating, "APB will await the report and recommendation of the Special Masters and evaluate that recommendation when it is made, but expects it will defer to the Special Masters." (Merck Decl. Ex. B ¶ 13.) It bears emphasis that nowhere does ABP suggest that the fee cap in its letter agreement with G&E should limit the fee award in the Merck Action.

Given the extremely large lodestar, which all the members of the Merck Lead Plaintiff Group appear to agree was reasonable and necessary to achieve the superb result, application of the individual retainer letter to the Fee Application would, in our view, drastically short-change Plaintiffs' Counsel. Indeed, if a fee of 15% were awarded – which would produce a fee of $32,250,000 for all Plaintiffs' Counsel to share -- the lodestar would be .71%. In other words, for all their effort and the risk they accepted, the Plaintiffs' counsel would receive a "negative" premium and be providing a 30% discount from their non-contingent billing rates. This result would contravene the very purpose of utilizing the POR method which "allows courts to award fees from the fund in a manner that rewards counsel for success. . . . " *Rite Aid*, *396 F.3d at 300 (quotation and citation omitted).*

81

In the final analysis, we conclude the G&E engagement letter should have no application here, and that the full support provided by the three member majority of the Merck Lead Plaintiff Group, who actively supervised Co-Lead Counsel in prosecuting the Merck Action, for a Fee Award in the amount of 28% and ABP's recognition that there were "significant risks," that the "settlement represents an excellent recovery for the class" (Merck Decl. Ex. 2 ¶ 9) and that G&E's "lodestar of $24,634,856.50 over the course of almost five years the was prosecuted . . .was reasonable and necessary to proceed with the action and achieve the result" *(Id. at ¶ 11)* adds further support for the Fee Application.

### (c) The Lodestar Cross-check

We now turn to the lodestar "cross-check" to stress test whether the suggested fee award of 28% of the Settlement Fund would be reasonable. In performing the cross-check, we apply the same rules enunciated by the Third Circuit discussed in the section of this Report and Recommendation addressing the fee application in the Schering Action and will not repeat them here. Suffice it to say, the abbreviated "cross-check" does not constitute a "full blown" lodestar calculation, and neither "bean counting" nor "mathematical precision" is required, and summaries may be relied on. *Rite Aid, 396 F.3d at 306-307.*

In the Merck Declaration, Co-Lead Counsel have submitted a summary of the lodestar for the hours expended by each of the law firms comprising Plaintiffs' Counsel. (Merck Decl. ¶ 136 and Exhibit M.) The following summary is contained in Exhibit M:

### Summary of Plaintiffs' Counsel
### Hours, Lodestar and Expenses by the Firm

| FIRM NAME | TOTAL HOURS | LODESTAR | EXPENSES |
|---|---|---|---|
| Grant & Eisenhofer, P.A. | 59,593.7 | $24,634,856.50 | $3,515,697.07 |
| Bernstein Litowitz Berger & Grossmann LLP | 30,817.5 | $13,813,696.25 | $ 575,860.01 |

| FIRM NAME | TOTAL HOURS | LODESTAR | EXPENSES |
|---|---|---|---|
| Labaton Sucharow LLP | 11,341.9 | $4,339,199.00 | $ 221,249.83 |
| Carella, Byrne, Cecchi, Olstein, Brody & Agnello, P.C. | 2,362.36 | $1,638,020.00 | $ 37,921.75 |
| Klausner & Kaufman, P.A. | 112.9 | $ 73,385.00 | $ 14,911.17 |
| Seeger Weiss LLP | 1,113.40 | $ 442,746.00 | $ 1,737.12 |
| **TOTAL** | **105,341.76** | **$44,941,902.75** | **$4,367,376.95** |

(Merck Decl. Ex. M.)

   In the supporting declarations submitted by each of the law firms, they included in the lodestar summary itemized hours expended on the case by each individual within the firm, provided the billing rates "that would be charged for their services on non-contingency matters" in their markets for legal services, along with declarations of partners from each law firm summarizing tasks and attesting to the preparation of the summaries from daily time records. (*See* Merck Decl. Exs. G, H, I, J, K and L.)

   The summaries submitted by Merck Plaintiffs' Counsel show an aggregate of 105,341.76 hours was spent on the prosecution and resolution of the Merck Action. (*See* Merck Decl. ¶ 136.) Based on these summaries, the Merck Plaintiffs' Counsel lodestar is $44,941.902.75 (derived by multiplying their hours by each law firm's current hourly rates for attorneys, paralegals and other professional support staff).[43]

---

[43]  As in the Schering Action, in keeping with the Third Circuit instructions for utilizing the abbreviated lodestar "cross-check", we have not fly-specked the summaries. We previously observed, however, that the hourly rates charged here by partners at Co-Lead Counsel BLB&G are in line with rates charged by other comparable law firms, including Paul, Weiss, Rifkind Wharton & Garrison, the Defendants lead counsel in the Merck Action. *(See note 27 supra.)* The same holds true for G&E. Indeed, the top rate charged by G&E is by Daniel L. Berger, a very experienced class action lawyer, whose hourly rate is $875 and appears to be extremely reasonable, if not a bargain.

The suggested 28% of the $215 million Settlement Fund would yield a fee of $60,204,000 (plus interest) under the POR method. This potential POR fee award divided by the $44,941,902 lodestar would produce a multiplier of only 1.34.

We believe this multiplier is extremely modest given the duration of the action, the complexity and difficulty and the very substantial investment of time and money required from Merck Co-Lead Counsel to shepherd the case to a successful conclusion against a powerful pharmaceutical company with top defense counsel and, perhaps most importantly, the very substantial risk that Plaintiffs' Counsel could come away completely empty-handed. As the Third Circuit stated in language directly applicable here: "We think the multiplier of 1.28 is well within a reasonable range, particularly given the district court's emphasis on the significant time and effort devoted to the case by class counsel." *AT&T, 455 F.3d at 173*. Indeed, "[M]ultipliers ranging from one to four are frequently awarded in common fund cases when the lodestar method is applied." *In re Prudential, 148 F.3d 283, 341 (3d Cir. 1998)* In short, we believe that all the factors that could justify a multiplier toward the higher end of the 1 to 4 accepted rate are present in the Merck Action. *See Cendant PRIDES, 243 F.3d at 742* ("[I]n all the cases in which the high percentages were applied to arrive at attorneys' fees, the Courts explained the extensive amount of work that the attorneys had put into the case, and appropriately the lodestar multiplier in those cases may exceed 2.99.") Viewed purely from the perspective of a lodestar calculation, we believe the presence in the Merck Action of numerous factors the Third Circuit cases have identified as supporting a multiplier toward the higher end of the accepted range, including risk, complexity and duration, a multiplier here of at least 2, if not higher, would be appropriate. Applying this multiplier to the lodestar of $44,941,902 would produce a fee of $89,883,804 – almost $30 million more than the suggested 28% POR would yield.

84

The extremely low multiplier in this case embodies many of the factors *Gunter*

*and Prudential* require be applied to select the POR and provides powerful confirmation that an

award at the 28% level suggested by Co-Lead Counsel and approved by three members of Lead

Plaintiff Group is reasonable.[44]

### (d) The Objections

#### – The DeJulius Objection

One of the only two objections to the Fee Application received in the Merck

Action was submitted by an individual named Franklin DeJulius ("DeJulius"), who purchased 2

---

[44] Given the extremely low multiple yielded by the lodestar cross-check and the abbreviated nature of the cross-check procedure, we have not found it necessary to seek clarification of certain questions raised by our review of the underlying Declarations. We note, for example, that G&E's lodestar appears to be understated by virtue of the omission of any time accrued by senior partner Jay Eisenhofer, Esq., who we know devoted substantial time to the settlement negotiations – attending several lengthy meetings, including one held at the courthouse that lasted the better part of the day, and a number of telephone conferences. We also observe that the Labaton firm, which is Co-Lead Counsel in the Schering Action, and on May 5, 2008 commenced the initial Merck class action in the District of New Jersey on behalf of Genesee County Employees' Retirement System ("GCERS"), Civil Action No. 2:08 CV 2177, devoted more than $4 million to the overall lodestar in the Merck Action although it had no "official" role in the Merck Action. The Merck Declaration's description of the roles played by the numerous law firms comprising Plaintiffs' Counsel omits any indication of the role played by the Labaton firm in the Merck Action. *(See* Merck Decl. ¶ 135, n.7.) In his accompanying declaration for the Labaton firm (Exhibit I), Mr. McDonald described his firm's role "as counsel to named plaintiff GCERS and describes several tasks undertaken in collaboration with Lead Counsel, which included providing GCERS with "regular updates on the status of the action". (Exhibit I, Paragraph 2.) Mr. McDonald enumerates other activities performed by Labaton which appear to have provided value to the Merck Class especially given the overlap of certain legal and factual issues with the Schering Action. The members of the Merck Lead Plaintiff Group appear to support compensation for the Labaton firm's activities by virtue of including its charges within the lodestar, which is described by Co-Lead Counsel as "fair and reasonable". (Schering Decl. ¶ 150.) After the appointment of the lead plaintiff, "the primary responsibility for compensation shifts from the court to that lead plaintiff, subject, of course, to ultimate court approval." *In re Cendant Sec. Litig., 404 F.3d 198 (3d Cir. 2005) ("Cendant II").* As Judge Becker observed, "any such compensation will normally come directly out of the class's recovery, and the PSLRA ensures that lead plaintiff has a large stake in that recovery. Any compensation paid to non-lead counsel may substantially reduce the recovery of the lead plaintiffs. Thus, lead plaintiff will have a direct financial interest in keeping down the fees of non-lead counsel." *404 F.3d at 198-99.* We interpret the Merck Declaration as vouching that the tasks were performed at the instance of Co-Lead Counsel and we believe they may be appropriately included in the lodestar. On the other hand, briefing GCERS – which is not a Lead Plaintiff – appears to duplicate Lead Counsel's role and to be excluded under *Cendant II, 404 F.3d at 201* ("non-lead counsel cannot be compensated out of the class' recovery for monitoring the work of lead counsel on behalf of individual clients"). In all events, we have concluded further "mathematical precision" is not required because it would not affect the lodestar cross-check. Even if we were to overcompensate by recalculating the lodestar cross-check without any of Labaton's time, the multiple still would be only 1.48 – still a very low multiple – well within an acceptable range providing strong support to the suggested few award.

shares in Merck on February 7, 2008 – almost a month after the January 14, 2008 disclosures revealed that Vytorin had failed the ENHANCE trial -- and who appears to have liquidated his entire portfolio on June 10, 2008. (DeJulius Objection, Ex. A.)  Represented by the law firm of Verdiramo & Verdiramo, DeJulius contends that "Class Counsel have requested a 28% fee award in this case while requesting 17% in a companion case *with similar risk*."  (DeJulius Objection at 1; emphasis added.)  Mr. DeJulius, however, provides no analysis, much less any basis, for his premise that the two cases presented similar risk profiles.  In reality, as we already have concluded, the Merck Action had a vastly higher risk profile.  Apart from the overarching risk presented by the failure of Merck's shares to drop meaningfully on January 14, 2008 – the Merck Plaintiffs had much more difficult issues of proof because the ENHANCE trial was conducted by Schering scientists, not Merck's, which provided significant additional challenges.  In addition, the allegations that Schering defendant Carrie Cox, a Schering executive, had engaged in substantial insider trading might have assisted the Schering Plaintiff Group to establish *scienter*, but there were no similar insider trading claims in the Merck Action.[45]

Based on the conclusory premise that the Schering and Merck Actions presented identical risk, which we consider counterfactual, Mr. DeJulius submits an article authored by Brian J. Fitzpatrick entitled "An Empirical Study of Class Action Settlements and Their Fee Awards," *7 J. Empirical Legal Stud. 81 (2010),* and argues that the fee awards in the Schering

---

[45]  DeJulius also argues without any support that "Class Counsel has not stated in its fee affidavits that no portion of the lodestar claimed in this case [Merck] was claimed in the Schering Plough case." (Objection at 1.)  This assertion is contradicted by both  the Merck Declaration and the Schering Declaration.  The Merck Declaration unequivocally states: "Plaintiff' Counsel have expended 105,341.76 hours in the investigation, prosecution and resolution of *the Action* against Defendants." (Merck Decl. ¶ 136; emphasis added.)  The "Action" is explicitly defined as the "above-captioned action", which is the Merck Action. (Merck Decl. ¶ 1.)  Likewise, the Schering Declaration attests that "Plaintiffs' Counsel have expended 125,177.49 hours in the investigation, prosecution and resolution of the Action." (Schering Decl. ¶ 152.)  The "Action" is explicitly defined as the "above captioned action", which is the Schering Action.  (Schering Decl. ¶ 1.)

and Merck Actions should be conflated: "[T]he Court should treat the two fee requests in this

case as one fee request, with one lodestar cross-check." (DeJulius Objection at 1.)

As a threshold matter, the Third Circuit in *Rite Aid* declined an objector's

invitation to conflate two different, but related cases stating in language applicable here:

> Kaufmann contends we should assess the aggregate $334 million settlement fund
> created by the Rite Aid I and Rite Aid II settlements. Class counsel respond we
> should consider only the $126.6 million from the Rite Aid II settlement. Even
> though the settlement in Rite Aid II resulted in the termination of the Rite Aid I
> appeal, *these are separate settlements, involving distinct legal issues and risks*
> *with which class counsel had to contend.* The Rite Aid I settlement resulted in a
> recovery of $193 million with a fee award of $48.25 million. That fee award is
> not under review. *Accordingly, we will not conflate the two distinct settlements*
> *and will consider only the reasonableness of the attorneys' fees based on the Rite*
> *Aid II settlement.*

*Rite Aid, 396 F.3d 294, 302, n. 11. (Emphasis supplied.)* Here, the Schering and Merck Actions

were separate class actions on behalf of completely different classes of securities holders in

different public companies. As in *Rite Aid*, the cases involved different legal issues and risks –

and they had completely different Lead Plaintiffs. Mr. DeJulius provides no justification for his

perfunctory contention and we can think of no sensible reason to conflate the fee applications --

after the cases were resolved.

Based on the single Fitzpatrick article, which is not predicated on Third Circuit

jurisprudence or limited to securities class actions,[46] Mr. DeJulius argues that the "mean" (or

average) "fee for cases that settle for between $100 million and $250 million is just slightly

---

[46] The article on which Mr. DeJulius relies is based on only an extremely limited two-year study of various types of class actions during 2006 and 2007 from across the country. As the article itself notes, "[T]he courts that use the percentage of the settlement method usually rely on a multifactor test" (which the article by footnote observes involves using different numbers of factors in different circuits) "and like most multifactor tests, it can plausibly yield a variety of results." (Class Action Fee Awards at p. 833.) Even though the limited two-year sample was country-wide, not from the Third Circuit, the sample size (*i.e.*, number of settlements) was limited in specific categories so the standard deviation was extremely high. Thus, the mean (or average) settlement between $100 and $250 million was 17.9%, but had a large standard deviation of 5.5%.

higher at 17.9%" and, therefore, "this court may not award class counsel more than 17% in either of the two cases." (DeJulius Objection at 2.) In language equally applicable to the DeJulius Objection here, the Third Circuit has squarely rejected slavish adherence to statistical "ranges" or "averages": "[T]hese varying ranges of attorneys' fees confirm that *a district court may not rely on a formulaic application of the appropriate range in awarding fees but must consider the relevant circumstances of the particular case.*"[47] *Cendant PRIDES, 243 F.3d at 736. Accord, Sullivan, 667 F.3d at 333.*

Of course, the DeJulius Objection is grounded in precisely on the kind of "formulaic" adherence to averages the Third Circuit has uniformly rejected. *Sullivan, 667 F.3d at 333; Cendant PRIDES, 243 F.3d at 736.* In *AT&T*, the Court of Appeals rejected the same discredited argument DeJulius makes here. There, the objector, like DeJulius, contended "[C]ourts are increasingly finding that class counsel can be reasonably compensated by a fee award that is substantially less than 20% of the settlement fund. . . They cite a study, which they cited to the District Court, concluding the average award for fees and costs in class action cases whose settlements were valued over $100 million was 15.1 %, and the average award for fees and costs in all cases was 18.4%." *455 F.3d at 172.* In upholding the district court's exercise of discretion in setting the fee, the Court of Appeals noted the distinctions advanced by class counsel to justify the award, which emphasized the "extent of litigation to create the Settlement Fund during the four years of litigation was 48,000 hours lead counsel spent on the case" and the "significant disparity between the originally requested fee award and the lodestar cross-check."

---

[47] Even if formulaic application of ranges were not contrary to Third Circuit law, which it is, the reliance on this single article disregards other more germane studies that address securities class actions, such as the often cited surveys by courts in the Third Circuit, *see, e.g., Cendant PRIDES, 243 F.3d at 737* and *Lucent, 327 F. Supp. 2d at 440-441*, and others published by respected economists, such as NERA and Cornerstone Research . Mr. DeJulius provides no evidentiary foundation for considering Professor Fitzpatrick's study in the form of expert testimony or other evidentiary basis.

*455 F.3d at 172.* As the *AT&T* court stated, "we think the multiplier of 1.28 is well within a reasonable range, particularly given the district court's emphasis on the significant time and effort devoted to the case by class counsel." *455 F.3d at 173.* In short, the Court of Appeals found the fee not to be excessive because the district court "justified its approval by demonstrating *the case was not an average case.*" *(Id. at 173.)* In sustaining the district court's exercise of discretion, the Court of Appeals pointed to "the size of settlement fund, the difficulty and length of the litigation, and the fact that all the benefits accruing to class members are properly credited to the efforts of class counsel." *(Id. at 174.)* These are the exact same factors we have concluded are present here. The *reducto ad absurdum* of the theory espoused by Mr. DeJulius is that all the recent Third Circuit cases sustaining fee awards above 17%, which he designates as the "market rate," are wrong and should be reconsidered. In light of Third Circuit decisions, such as *Sullivan*, an *en banc* 2011 decision by the Third Circuit, sustaining a fee award of "25% of the $293 million principle settlement fund," Mr. DeJulius' *ipse dixit* "one percentage fits all" theory is contrary to the controlling Third Circuit law. *See also, AT&T, 455 F.3d at 172* (rejecting reliance on "a study . . . concluding average award for fees and costs in class actions valued over $100 million was 15.1%.")

Contrary to the DeJulius' Objection, *Sullivan* squarely held that the "fact-intensive *Prudential/Gunter* analysis must trump all other considerations." *667 F.3d at 331.* Accordingly, we conclude that Mr. DeJulius' contention that the "average" based on a single article constitutes a "market rate" that must dictate the amount of fees awarded in the Merck Action in which an enormous benefit for the class was produced entirely by the superb and dogged performance of Plaintiffs' Counsel should be rejected.

– **The Orloff Objection**

The only other objection to the Merck fee application is by the Orloff Family

Trust d/t/d 12/13/01 and Dr. Marshall Orloff (the "Orloff Objection") – the same serial

objectors who also objected to the Schering Fee Application. The objection to the Merck Fee

Application appears to be cut from the same standard form as the Orloff Objection in the

Schering Action – even containing the identical incorrect caption denominating the court as the

"Southern District of New Jersey." It erroneously states that "class counsel fails to disclose their

actual lodestar in their motion. . . . " (Orloff Objection at 5.) In fact, the Merck Declaration is

pellucid in stating:

> As summarized in Exhibit M hereto, Plaintiffs' Counsel have expended
> 105,341.76 hours in the investigation, prosecution and resolution of the Action
> against Defendants, for a collective lodestar value of $44,941,902.75 through May
> 31, 2013. Under the lodestar approach, a fee award of 28% of the Settlement
> Fund yields a multiplier of 1.34 on the lodestar. This multiplier is within the
> range of multipliers awarded in actions where similar settlements have been
> achieved. *See* Fee Memorandum at Legal Arg. § I.C.2 (i). (Emphasis supplied.)

Merck Declaration at ¶ 38. (Footnote omitted.)

The balance of the perfunctory objection is *in haec verba* with the Orloff

Objection to the Schering Fee Application. For the reasons already discussed at length in the

Schering Fee Application, we believe the Orloff objection lacks merit and should be rejected.

**F.     Merck Co-Lead Counsel's Request for Reimbursement for Litigation Expenses**

Merck Co-Lead Counsel's fee application also seeks reimbursement for litigation

expenses reasonably incurred in and necessary to the prosecution of the Action in the amount of

$4,367,376.95 (Merck Decl. ¶¶ 154.) In support, each of the law firms comprising Plaintiffs'

Counsel have submitted declarations attesting to the accuracy of their expenses along with a

summary categorizing the type of expenses incurred and the amounts incurred in each category.

(Merck Decl. Exs. G, H, I, J, K and L.)

It is well-established that the kinds of expenses for which reimbursement is sought may be properly recovered by counsel. *In re Safety Components, Inc. Sec. Litig.*, *166 F. Supp. 2d 72, 108 (D.N.J. 2001)* ("[c]ounsel for a class action is entitled to reimbursement of expenses that were adequately documented and reasonably and appropriately incurred in the prosecution of the class action"); *Hall, 2010 WL 4053547, at \*23* ("Courts have generally approved expenses arising from photocopying, use of the telephone and fax, postage, witness fees, and hiring of consultants.").

As Co-Lead Counsel represents, "from the very beginning of the case, Co-Lead Counsel were well aware that they might not recover any of their out-of-pocket expenses until the Action was successfully resolved. Thus, Co-Lead Counsel were instructed to, and did, take significant steps to minimize expenses as much as practicable without jeopardizing the efficient prosecution of the case" (Merck Decl. ¶ 153.) Out of the total expenses, almost 66% were for outside experts and consultants $2,293,300 (54%) and document production copying costs ($503,388) (11%). (*See* Merck Decl. ¶¶ 156 to 157; *See* Merck Decl. Ex. G Declaration of Daniel L Berger, Esq., Ex 2 "internal copying $503,988.) Other major expenses included responding to third-party subpoenas ($191,835.74) and a mock trial ($200,493).

Members of the Lead Plaintiff Group have expressed views "that the litigation expenses being requested for reimbursement to Co-Lead Counsel are reasonable and expenses necessary for the prosecution and resolution of this complex securities fraud action. . . ." (Merck Decl. Ex. D, ¶ 17.) (*See also,* Ex. C, G&E expenses "were reasonable and necessary".) No objection to the reimbursement of litigation expenses has been filed which further supports the application. *In re Par Pharmaceuticals, 2013 WL 3930091 (D.N.J. July 29, 2013); Lucent, 327 F. Supp. 2d at 463.)*

In the Merck Action, the ratio of expenses to the lodestar reflects expenses that are under 10% of the value of time. We have also compared the litigation expenses requested here against NERA's analysis of the median expenses awarded in settlements of similar size in *Recent Trends In Securities Class Action Litigation: 2012 Full Year Review*. For settlements between $100 million and $500 million, the median expenses were 1.4% for settlements between 1996 and December 2009 and 1.2% for settlements between January 2010 and December 2012. Although, the $4,367,000 is well above the median which would be $3.0 million and $2.6 million, respectively, the members of the Lead Plaintiff Group and Co-Lead Counsel had every incentive control the expenditures – they might never be recovered – and the complexity, difficulty and length of the Merck Action could explain why the expenses would be among the half of cases above the median. The expenses, however, appear to be well within the 2.7% - 2.8% "mean" or average of the recovery for class actions as found by Professors Eisenberg and Miller, which would be $5,805,000 - $6,020,000. We note that in *AT&T,* where the lodestar was only $21.25 million based on 48,000 hours devoted to the case (*455 F.3d at 169, 172)*, the district court "approved class counsels' request for reimbursement of expenses in the amount of $5,465,996.79 finding the expenses were reasonably and appropriately incurred during the prosecution of this case, and sufficiently documented in the declarations." *455 F.3d at 160.*

On the current record, however, we are unable to approve the reimbursement request. Given the correlation between the time billed to a case and the expenses incurred (*see* Eisenberg & Miller at 26), we are concerned by the incongruity between the significantly higher amount of expenses incurred in the Merck Action compared to the much lower expenses incurred in the Schering Action, which had a significantly higher lodestar. In the Schering Action, the litigation expenses were $3,620,049.60 based on total hours of 126,177.49 and a total lodestar

value of $59,450,360. In contrast, the litigation expenses in the Merck Action were more than $700,000 higher at $4,367,376.95 based on total hours of 105,341.76 for a total lodestar value of $44,941,902.75. Apparently, we are not alone in expecting the litigation expenses would be lower in the Merck Action than in the Schering Action. In the Notices of the Motion for Reimbursement of Litigation Expenses sent to the Classes in the two Actions, the Schering Class was informed reimbursement for litigation expenses would not exceed $5,250,000 while the Merck Class was informed reimbursement of litigation expenses would not exceed $5,000,000 -- $250,000 less than in the Schering Action. (*Compare* Schering Decl. Ex. 6, Ex. A. at p. 2 *with* Merck Decl. Ex. F, Ex. A. at p. 2.)

The Merck Declaration does not attempt to explain the disparity of more than $700,000. In light of the close coordination of discovery between the Merck and Schering Actions, the overlap of lead counsel, and the shared litigation expense funds, we are unable to rule out at least the possibility that some expenses that were properly attributable to the Schering Action inadvertently were shifted to the Merck Action.

Accordingly, we are constrained to temporarily defer our recommendation on this aspect of the application and request Merck Co-Lead Counsel to submit by September 6, 2013 a supplemental declaration containing additional information addressing the reason for the disparity and providing additional support for the request. We also request the supplemental declaration contain confirmation from Co-Lead Counsel that they have carefully reviewed the expenses from all the other law firms included in the lodestar and that none of the Merck expenses for which reimbursement is sought were incurred in connection with activities that

under *Cendant II* are not appropriately charged to the Class as opposed to individual clients.[48] As

no objection has been made to the Merck application for reimbursement of litigation expenses

and no viable appeal could be filed on this specific aspect of the Merck Fee Application, we

believe that ample time exists to receive the additional information and be able to provide the

Court with our recommendation in advance of the Hearing.

## G.    Members of Merck Lead Plaintiff Group  Request for Reimbursement of Costs and Expenses

The members of the Merck Lead Plaintiffs' firms also seek reimbursement of

costs and expenses in the aggregate amount of $109,865.31 incurred by them directly relating to

their representation of the Class. (Merck Decl. ¶ 163.)   Each of the Lead Plaintiffs have

submitted a declaration by a representative detailing the time and effort devoted to their roles as

members of the Merck Lead Plaintiff Group and cost of their time which  could not be devoted

to their other regular activities.  (Merck Decl. ¶ 161; *see* Exs. B, C, D and E to Merck Decl.)

As noted in our discussion of the Schering fee application, the Third Circuit

favors encouraging class representatives, by appropriate means,  to create common funds and to

enforce laws – even approving "incentive awards" to class representatives. *Sullivan, 667 F. 3d at*

*333, n.65.* Although the PSLRA specifically prohibits incentive awards or "bonuses" to Lead

Plaintiff, it specifically authorizes an "award of reasonable costs and expenses (including lost

wages) directly relating to the representation of the class" may be made to "any representative

party serving on behalf of a class." 15 U.S.C. § 77u-4(a)(4).  Indeed, Congress explicitly

---

[48]    Unlike the lodestar cross-check calculation, where we concluded the possible inclusion of time charges that *Cendant II* holds are properly chargeable to an individual client rather than the Class, made no difference to the "cross-check" because the multiple was so low, expenses incurred by any of the various law firms for services performed for  individual clients who are not  members of the Merck Lead Plaintiff Group or expenses related to performing other tasks  for which compensation is foreclosed  by *Cendant II*, no matter how small would adversely impact the Merck Class dollar for dollar.

acknowledged the importance of awarding appropriate reimbursement to class representatives. *See H.R. Conf. Rep. No. 369, 104th Cong., 1st Sess. 35 (1995)* ( "The Conference Committee recognizes that lead plaintiffs should be reimbursed for reasonable costs and expenses associated with service as lead plaintiff, including lost wages, and grants the courts discretion to award fees accordingly.")

Here, Merck Lead Plaintiffs, ABP, IFM, Jacksonville and Detroit, seek reimbursement of their reasonable costs and expenses incurred directly in connection with their representation of the Class in the amounts of $34,557.41, $45,682, $13,455.90 and $16,170, respectively. (Merck Decl. ¶ 161.) The amount of time and effort devoted to this Action by the Lead Plaintiffs is detailed in the accompanying declarations of their respective representatives. *(See* Merck Decl. Exs. B, C, D. and E.) The time charges sought range from $22 per hour to $161 per hour, which appear reasonable.

Here, members of the Merck Lead Plaintiffs Group have collectively devoted more than 700 hours to the Merck Action, which included time spent, *inter alia*: (i) reviewing pleadings and case materials; (ii) corresponding with Co-Lead Counsel about the status and strategy of the case; (iii) responding to document requests and producing documents; (iv) preparing for depositions and appearing at depositions; and (v) preparing for, attending and participating in, multiple in-person mediation sessions and other settlement negotiations. *(Merck Decl. Exs. B, C, D and E.)* We conclude the amount of time devoted by each of the members of the Merck Lead Plaintiff Group and the out-of-pocket expenditures for which reimbursement is sought appear reasonable.

## H.    The Merck Recommendations

In applying the various factors mandated by Third Circuit case law to determine under the POR method a reasonable fee to be awarded to Co-Lead Counsel, we have attempted

"to evaluate what class counsel actually did and how it benefitted the class." *AT&T, 455 F.3d at 165-66.* Based on our analysis, we believe Co-Lead Counsel achieved an outstanding settlement for the Class which was due exclusively to Co-Lead Counsels' perseverance and skill in prosecuting a very difficult and lengthy case without any assistance from restatements, criminal convictions or companion SEC proceedings. Plaintiffs' Counsel undertook this case purely on a contingency basis and accepted the extremely significant risk their enormous amounts of time and money invested in this case might not be recovered. The suggested 28% fee award is supported by the three of the four institutional members of the Merck Lead Plaintiffs Group (while the fourth member ABP has reserved its view pending our Report and Recommendation) and the lodestar "cross-check" strongly confirms that a 28% fee award sought is extremely reasonable, reflecting the herculean effort demanded by this complex five-year litigation. Finally, we note the extremely low number of objections which the Third Circuit has characterized as a "rare phenomenon" reinforces our view. In light of the foregoing and for the reasons discussed at length in the Report and Recommendations, we recommend the Court **GRANT** Merck Co-Lead Counsels' motion for an award of attorneys' fees in the amount of 28% of the Settlement Fund (plus interest).

For the reasons stated above, we **DEFER** our recommendation with respect to the motion of Co-Lead Counsel to be reimbursed for expenses in the amount of $4,367,376.95, pending receipt of supplemental information requested *no later than September 6, 2013*.

We also recommend that the Court **GRANT** the motion of Lead Plaintiffs to be reimbursed for costs and expenses in the total amount of $109,865.31.

Dated: August 27, 2013

STEPHEN M. GREENBERG                    JONATHAN J. LERNER

/s/: Stephen M. Greenberg                /s/: Jonathan J. Lerner

SPECIAL MASTER                           SPECIAL MASTER